## S. S. ALLEN GROCERY COMPANY, Appellant, v. BANK OF BUCHANAN COUNTY, Respondent.

**Kansas City Court of Appeals, January 17, 1916.**

1. **NEGOTIABLE INSTRUMENTS: Checks Signed in Blank.** The plaintiff, president of a corporation, before going on his vacation signed some checks in blank and left them with his manager. While the manager was out a traveling salesman stole the checks, filled in certain amounts, and cashed them at different places and the defendant bank paid the checks when they were presented. *Held*, a depositor of a bank should affix his signature to a blank check only for the purpose of directing the bank to pay out the money and that the risk of signing and then keeping a blank check, whether the keeping be careful or negligent should be considered a risk the maker voluntarily assumed.

2. ——: ——. Where an incomplete instrument has not been delivered, it will not, if completed and negotiated without authority, be a valid contract in the hands of any holder as against any person whose signature was placed thereon before delivery.

3. ——: ——. The relation of banker and depositor is that of debtor and creditor and as to a checking account the contractual obligation assumed by the banker is to pay on presentation the checks drawn by the customer against the deposit. But the banker is under no legal or contractual duty to allow a customer to overdraw his account and as to the checks he pays which cause an overdraft, may be regarded, not as a debtor who has discharged a legal duty to a creditor, but as a voluntary purchaser or holder for value of negotiable paper.

Appeal from Buchanan Circuit Court.—*Hon. Thos. B. Allen,* Judge.

AFFIRMED.

*Culver & Phillip* for appellant.

*C. F. Strop, Graham & Silverman* for respondent.

JOHNSON, J.—This is an action against defendant bank by the depositor of a checking account to recover a deposit of $2938.70. On August 27, 1914, plaintiff, the depositor, presented a check for 'that amount to the bank but payment was refused on the ground that plaintiff had no funds on deposit and this suit followed. The answer alleges that defendant "has paid to plaintiff or upon its order all sums of money that have been deposited by plaintiff with defendant." A jury was waived and after hearing the evidence the court rendered judgment for defendant. Plaintiff appealed.

At the beginning of the trial the parties agreed that on August 27, 1914, plaintiff had a deposit of $2938.70 with defendant which was payable on demand unless it should be found that defendant was justified in charging against the deposit, as it did, three checks dated August 15, 1914, which bore the signature of plaintiff and purported to have been drawn to the order of O. J. Rose. These checks which were for the respective amounts of $2700.95, $395.60 and $195.15, were paid by defendant on presentation and charged to the account of plaintiff. They had been signed in blank by plaintiff but had been stolen from its office by Rose who, by forgery, had converted the signed blanks into checks for the respective sums stated.

Plaintiff, a corporation, operating a large retail grocery in St. Joseph, has a president, secretary, general manager, six or seven chiefs of departments and about fifty employees. Its office is in a mezzanine room six or seven feet above the first floor of the store and is reached by a narrow stairway from that floor. It is occupied by the officers, i. e., president, secretary and general manager, and the stenographer and telephone operator. Persons having business with these officers have access to the office which may be designated as the general office of the company and of the

business it conducts. The president, S. S. Allen, alone has authority to sign checks on behalf of the company and such authority never has been conferred upon any other officer. When Allen found it necessary to be absent from the city it was his custom to sign a number of blank checks and leave the check book in the custody of the manager, with authority to fill out the blanks and issue checks for use in carrying on the business until his return. He was absent on his summer vacation when the events under consideration occurred and, as usual, had signed plaintiff's name to a number of checks and had left the book with Mr. Morrow the manager. Following his usual practice, Morrow had allowed this book to remain on the top of his desk in the office without instructions to anyone respecting its safe keeping and when he had occasion to issue a check, sometimes would draw it himself, and sometimes would have the secretary or stenographer draw it.

On August 15, 1914, Rose, a traveling salesman who had been selling merchandise to plaintiff and was well acquainted with its officers and office employees, especially with the manager, visited the office during the luncheon hour and found no one there but the stenographer. On being informed that Morrow, for whom he inquired, was out for lunch, he asked and was accorded the privilege of writing some letters and seated himself at Morrow's desk on which the check book was lying in full view and, of course, within easy reach. When the telephone operator returned from lunch, the stenographer left the office in her charge and shortly thereafter Rose, apparently having finished his writing, asked for and was given an envelope into which he placed some papers. Then he departed without waiting for Morrow to return. Some time while at the desk he surreptitiously cut out a sheet from the check book which contained three signed blanks and

their stubs.    After filling out the blanks, Rose went first to defendant bank where he was known to the paying teller and presented the check for $395.50 which the teller paid, finding the signature genuine. Next he went to the Empire Trust Company, where he was also known, and presented the check for $2700.95 and, at his request, was given a cashier's check which subsequently he cashed at a bank in Atchison.    Then he went to a jewelry store and passed off the third check in payment of a diamond he purchased.    After this he disappeared and thus far has eluded capture. The check for $2700.95 came to defendant through the clearing house bearing the indorsement of the Empire Trust Company and was honored by defendant though its payment overdrew plaintiff's account by more than $600.    The third check for $195.15 also passed through the clearing house with the indorsements of the jeweler and the Tootle-Lemon National Bank and was paid by defendant, further increasing the overdraft.

From all the facts and circumstances in evidence the inference is strong that Rose who two or three days before had received a check from Morrow in payment of an account for potatoes he had sold plaintiff had obtained knowledge through that transaction of the fact that the check book contained signed blanks and was allowed to remain on top of the manager's desk without any special watch being kept over it. Doubtless his visit to the office at the noon hour was prompted by a criminal motive and his theft of the sheet was not the result of a mere accidental opportunity which arose while he was waiting for Morrow to return.

After paying the last-mentioned check, defendant notified plaintiff of the overdraft and the discovery of the forgeries was a quick result of this notice.    The good faith of defendant in paying the checks is not

and cannot be questioned, but an effort was made by plaintiff at the trial to show that defendant had been negligent, especially in view of the facts that plaintiff, during the long period of its relation to defendant of depositor, which had continued a number of years, had never before overdrawn its account nor issued a check for so large a sum as $2700. We shall treat these facts as proved for the purposes of the present discussion, but the inference of negligence drawn from them by plaintiff will be considered in the course of our opinion.

The principal argument of counsel for plaintiff in support of their contention that the loss caused by the crime of Rose should fall upon defendant assumes the good faith and reasonable care of defendant in the transaction but would charge it with liability on the ground that its title to the checks was that of an innocen holder for value within the technical definition of that term, and that the checks never having been delivered by plaintiff did not become valid negotiable instruments nor acquire any contractual status or obligatory character by the mere affixing of plaintiff's signature to blanks which thereafter plaintiff retained in its own possession until deprived thereof not by or through its own voluntary act but by theft. Counsel insist that their position has the support of the weight of authority as it stood at the time of the passage of the Negotiable Instruments Act and is completely and irrefutably sustained by that Act which provides (Sec. 9986, R. S. 1909): "Where an incomplete instrument has not been delivered it will not, if completed and negotiated without authority, be a valid contract in the hands of any holder, as against any person whose signature was placed thereon before delivery." Especially is this argument urged against the validity of the checks of $2700.95 and $195.15, the payment of which not being made out of funds of plaintiff on

deposit, was voluntary on the part of defendant and should be regarded as the act of a purchaser rather than that of a debtor bound by law to honor the demand of his creditor.

The position of defendant is that the relation between the parties being that of banker and depositor involved reciprocal duties peculiar to such relationship which lie outside the scope of rules pertaining to holders for value of negotiable instruments and that one of the duties of plaintiff towards defendant forbade the former from signing blank checks except for the sole purpose of directing defendant to pay them, and that in signing such blanks and then negligently exposing them to theft, plaintiff was guilty of such a breach of duty as to estop it from claiming the checks were not delivered or were not binding, contractual orders to pay money which defendant as banker and debtor was bound to honor on presentation.

On the theory of plaintiff that the position of defendant is that of a mere purchaser, or innocent holder, for value, the questions to arise are interesting and difficult of solution. If this were a case where an agent to whom the drawer had delivered a signed blank check had exceeded his authority with reference to filling out the blanks, the drawer would be held liable for such unauthorized acts of his agent under the maxim that where one of two innocent persons must suffer, the one must be the sufferer who gave occasion for the commission of the wrong (Bank v. Armstrong, 62 Mo. 59) and the delivery of the check to the agent would preclude the application of the provisions of section 9986, Revised Statutes 1909, since they relate only to cases where there has been no delivery of the instrument by the person signing it.

In the present case, though Morrow, the manager, was invested with special authority to fill out and deliver the signed blanks, they remained in the posses-

sion of plaintiff, the drawer, and had not been delivered to any person at the time of the theft. The custody of the manager, who was the ranking executive officer of the corporation in the absence of the president, was the custody of the corporation, and when the blanks were stolen they were in the condition of being signed but still in the possession of the corporation which signed them. As a general rule the delivery of an incomplete negotiable instrument by the maker who signs it is indispensable to the creation of a contractual obligation on the part of such maker. Until delivery the instrument is but so much waste paper. The provisions of section 9986 are merely a legislative enactment of this rule, which had the support of the great weight of authority when the Negotiable Instrument Act was adopted in this State. We think this section was not intended to abrogate or impair other well-recognized rules by which in certain instances delivery by the maker would be implied, either from authority actually conferred by him upon an agent, or from conduct which should estop him from claiming that he had not delivered or authorized the delivery of the signed instrument. If Morrow, who had authority to fill out blank checks and deliver them for the uses of plaintiff's business, had, in excess of that authority, converted funds of plaintiff to his own use through the pretended exercise of such authority, plaintiff could not have escaped liability to an innocent holder of such paper, since under the maxim we have noted, authority to do the excessive act would be implied from the authority actually given.

While estoppels are odious and will not be lightly invoked, they do obtain in instances where it would be manifestly unfair and unjust to suffer a party to gain an advantage by taking inconsistent positions and they may be based upon conduct which is so careless and grossly negligent as to amount to a willful indifference to the rights of others. In the leading case of Burson

v. Huntington, 21 Mich. 416, it is pertinently observed: "We do not assert that the general rule we are discussing—that 'where one of two innocent persons must suffer,' etc.—must be confined exclusively to cases where a confidence has been placed in some other person (in reference to delivery) and abused. There may be cases where the culpable negligence or recklessness of the maker in allowing an undelivered note to get into circulation, might justly estop him from setting up non-delivery; as if he were knowingly to throw it into the street, or otherwise leave it accessible to the public, with no person present to guard against its abduction under circumstances when he might reasonably apprehend that it would be likely to be taken."

It may be conceded for argument, as was held by BRAMWELL, L. J., in Baxendale v. Bennett, L. R. 3 Q. B. Div. 525, that mere negligence in the keeping of a signed blank negotiable instrument which afterward was stolen, filled out and put into circulation by a thief should not be regarded as the proximate cause of the loss since the negligent person was not bound to anticipate that a crime would be committed in consequence of his negligence, but obviously it should be held that such a grossly careless act as leaving money exposed and within easy reach of thieves, should be regarded as the proximate cause of a loss by theft; and in the suppositious case of a man signing a check in blank and tossing it into a public street, an act evincing such an extreme and reckless departure from the field of ordinary care and prudence, and such a wanton indifference to the rights of subsequent purchasers, or others who might innocently come into possession of it, would call for the application of the rule of estoppel and preclude the actor from claiming that he had not delivered the instrument.

The opinion of Lord BRAMWELL in the Baxendale case, supra, much relied upon by plaintiff, instead of

being an authority against the distinction just pointed out, is found to give it express sanction. In that case a bill of exchange which the defendant had signed in blank as an indorser had been returned to him unused and he had put it in a drawer in his desk in his private chambers from which a thief took it, filled out the blanks and put it into circulation. Lord BRAMWELL thought defendant had been negligent in the care of the paper if judged by the standard of care a bailee should have followed, but in reaching the conclusion that not such negligence but the crime of the thief was the proximate cause of the loss, he distinguished the case from the earlier English cases of Young v. Grote, 4 Bing. 253, and Ingham v. Primrose, 7 C. B. (N. S.), 82, where the negligence was so gross as to amount to recklessness on the ground that they were treated as instances where the alleged maker or acceptor was held liable as one who had voluntarily parted with the instrument. Lord BRETT would not concur in the view that the defendant had been negligent at all and predicated his decision for defendant on the ruling that he was not liable since he had not delivered the paper. The third judge, Lord BAGGALLAY, merely "concurred that the judgment ought to be entered for the defendant." The court, therefore, did not concur in finding that the defendant had been negligent and certainly did not overrule the earlier cases which recognized the doctrine that gross negligence in the care of such paper should be treated as a voluntary delivery by the maker or acceptor.

Other authorities dealing with the subject in hand to which our attention is called by counsel for plaintiff do not challenge the view that the conduct of the maker or acceptor of a negotiable instrument signed in blank may be sufficient to create an estoppel, though they do agree that the mere signing and withholding from delivery of such paper is not enough to constitute neg-

ligence and that liability as upon paper delivered by the maker or acceptor will not be imputed from a mere lack of ordinary care in the custody of the paper after it is signed. [Linick v. Nutting, 125 N. Y. S. 93; Crawford, Neg. Inst. Laws, secs. 25, 34 and note; Caulkins v. Whisler, 29 Ia. 496; Nance v. Lary, 5 Ala. 370; Salley v. Terrill, 50 Atl. (Me.), 896; Knoxville Nat'l Bank v. Clark, 1 N. W. 1. c. 496; 7 Cyc. 619-20; Daniel, Neg. Inst. (6 Ed.), secs. 839-841.]

In Linick v. Nutting, supra, the rules were recognized that "one can only part with title to personal property by his voluntary act or by conduct sufficient to create an estoppel;" that the delivery of a negotiable instrument is necessary to a valid inception of the contract; that possession of such instrument by an innocent holder for value is prima-facie evidence of delivery (see Sec. 9987, R. S. 1909) and that if it appears that such instrument "has never been actually delivered and *that without any confidence, or negligence, or fault of the maker,* (Italics ours) but by force or fraud, it was put into circulation, there can be no recovery on it even in the hands of an innocent holder."

Certainly this case is an authority sustaining the conclusion that under the rules of the Negotiable Instruments Act which are considered and discussed, the maker or acceptor may be guilty of conduct in the care of the paper which would estop him from disputing the title of an innocent holder on the ground that he had not delivered the paper or voluntarily put it into circulation. Was plaintiff, in the instant case, guilty of conduct sufficient to raise an estoppel against the claim that it did not deliver the checks nor voluntarily put them into circulation? Allen, the president and principal stockholder of the plaintiff corporation, controlled its policies and business affairs. He was an able, experienced and careful merchant who had suc-

ceeded in building up a large and successful business and it is with much reluctance that we give expression to the conviction that in adopting and pursuing the course of business under consideration, he and the manager who acted under his orders were grossly negligent in keeping the book of signed blank checks in such an exposed place without taking any precautions to guard against its spoliation. In the manager's use of the book, knowledge was imparted not only to the employees but to others who visited the office on business, that it contained signed blank checks. That fact may be said to have been publicly proclaimed and by offering such easy opportunities for the commission of a crime, plaintiff was as much a tempter of the criminally minded and morally weak to whom such opportunity might come as it would have been had it left money lying unwatched and exposed in the office, or, as in one of the English cases, had signed a blank check and tossed it into the street. Certainly plaintiff, when it signed the checks, must be held to have anticipated that in the usual course of business they would be issued and that some of them would pass into the hands of innocent holders for value before presentation to defendant for payment, and it owed a duty to such holders, despite the fact that they were under no legal obligation to acquire title or ownership of such paper, to exercise some care in its custody during the interim between the signing and delivery thereof.

Regarding defendant merely in the light of an innocent holder for value we think the facts of the case upon the plainest principles of fairness and justice estop plaintiff from taking the position that, as to such holder, it did not voluntarily part with the possession of the checks and, therefore, in law, deliver them.

We have gone thus extensively into this aspect of the case for the reason that we think the position of

defendant with respect to the two checks of $2700.95 and $195.15 should be regarded as that of an innocent holder for value and not that of a debtor bank to a depositor. We are aware that in some of the cases cited by defendant, e. g., Trust Co. v. Conklin, 119 N. Y. S. 367, and Snodgrass v. Sweetser (Ind.), 44 N. E. 648, no distinction appears to be observed between the status of a bank which pays a forged check signed by the depositor out of funds on deposit to his credit and of a bank which pays such check, thereby creating an overdraft. The relation of banker and depositor is that of debtor and creditor and as to a checking account the contractual obligation assumed by the banker is to pay on presentation the checks drawn by the customer against the deposit. But the banker is under no legal or contractual duty to allow a customer to overdraw his account and as to checks he pays which cause an overdraft, may be regarded, not as a debtor who has discharged a legal duty to a creditor, but as a voluntary purchaser or holder for value of negotiable paper.

As to the check for $395.60 which was paid when plaintiff had a larger sum than that on deposit, the relationship between the parties was purely that of depositor and banker—creditor and debtor—and plaintiff owed a duty of care to the bank greater than that which the maker of a negotiable instrument owes to subsequent holders for value. Any negligent breach of that duty which directly results in loss would charge the depositor with liability for such loss. As, for example, it is well settled in this State that where after delivery of a completed check it is raised by forgery, the loss must fall on the maker if he negligently inserted the amount in a way to admit of the easy addition by forgery of other words and figures. [Bank v. Armstrong, 62 Mo. l. c. 67.]

Considering the facts that a bank must honor the checks of its depositor and cannot by the exercise of any degree of skillful inspection detect a forgery of a check signed and delivered in blank, we think every consideration of justice and common sense sustains the conclusion that a depositor should affix his signature to a blank check only for the purpose of directing the bank to pay out the money, and that the risk of signing and then keeping a blank check—whether the keeping be careful or negligent—should be considered a risk the maker voluntarily assumed. [Trust Co. v. Conklin, supra; Snodgrass v. Sweetser, supra; Putnam v. Sullivan, 4 Mass. 45.] If the exigencies of the depositor's situation create a necessity for the signing of checks in blank and then keeping them a time before putting them into circulation, why should he not bear the risk made by his own necessities, rather than the banker who is a stranger to them, and is under the contractual duty to honor his written orders for the payment of money? He is the one who, in the service of his own interest, has given occasion for the commission of the wrong, and under the familiar maxim, is the one who should bear the consequences.

It follows from the foregoing considerations that whether defendant be treated as an innocent purchaser of the checks for value, or as a banker who paid them in discharge of a contractual obligation to a depositor, the loss of the forgeries should fall upon plaintiff. Defendant cannot be charged with negligence from the fact that the body of the checks was not in the handwriting of Morrow or any of plaintiff's officers or office employees. A bank is bound to know the signature of a depositor, but is not bound to draw a suspicious inference from the discovery that the body of the check is in unfamiliar handwriting. As is said in 2 Daniel on Neg. Inst. (6 Ed.), sec. 1654a: "A bank is not bound to know more than the signature of the

drawer of the check; for in the ordinary course of business the body of the check is as often as otherwise filled up by a clerk, and it is by no means a matter of suspicion that it is not filled up in the handwriting of the drawer. If the rule were otherwise, a bank could never safely pay a check filled up in a handwriting not the drawer's, until it had inquired of the drawer whether it was properly filled up. And to require this would greatly embarrass commercial transactions.''

Nor was it a thing to excite suspicion that one of these checks was larger in amount than any plaintiff previously had drawn and that it overdrew the account.

The "judgment is for the right party and is affirmed.

All concur.