BESSIE I. FOSTER, RESPONDENT, v. MODERN WOODMEN OF AMERICA, A CORPORATION, APPELLANT.—137 S. W. (2d) 18.

Kansas City Court of Appeals. January 29, 1940.

388

*George G. Perrin, George H. McDonald, Alfred S. Edler* and *Adams, Adams & Adams* for appellant.

*Edgar J. Keating* and *Robert B. Vaughan* for respondent.

CAMPBELL, C.—Plaintiff brought this suit on October 30, 1935, to recover $1500 on a benefit certificate issued on September 15, 1923, by the defendant, a fraternal benefit society, to Joseph M. Smith, one of its members, in the amount of $3000, made payable to plaintiff and her sister as beneficiaries in equal amounts. The defendant, on trial to a jury, had a verdict and judgment. The plaintiff's motion for new trial was sustained on the ground the court erred in giving defendant's Instruction "G." The defendant has appealed.

The petition, upon which the cause was tried, alleged facts sufficient to entitle plaintiff to the relief sought.

The answer admitted the issuance of the certificate as alleged in the petition; that plaintiff was the beneficiary therein to the extent of $1500; that insured died on November 28, 1933; that at the time of his death he was in good standing; that during the life of the insured he performed all of the requirements of said certificate on his part to be kept and performed; that plaintiff had offered to furnish proofs of death and had demanded payment; that the defendant had denied

liability and refused to pay her and pleaded seven defenses, described in the answer as "affirmative defenses," as follows:

First, that insured, on September 13, 1924, changed the beneficiaries in his certificate from plaintiff and her sister to her sister alone; that said "certificate was delivered to and accepted by" insured. Second, that after the death of insured defendant paid plaintiff's said sister the full amount of the insurance. Third, that after the death of insured and before defendant had paid the full amount of the certificate to plaintiff's said sister, plaintiff knew that her sister was demanding and claiming the full $3000 from defendant and knew that her sister was preparing proofs of death; that she assisted her sister in preparing and submitting said proofs of death and that plaintiff, with knowledge of the claim of her sister for the full amount of said certificate, to-wit, $3000, stood by and failed to notify defendant of her claim; that defendant relying upon the facts stated in the proofs of death and the statements made therein by plaintiff and her sister without any knowledge or notice that said plaintiff claimed any of said benefits, paid plaintiff's said sister the full amount of the certificate; that by reason of all of these circumstances, plaintiff was estopped from claiming or asserting any claim for any of the benefits arising out of the membership of insured in defendant's society. Fourth, that plaintiff's sister died shortly after she collected said insurance money; that plaintiff did not notify defendant of said death and defendant did not learn thereof until after the filing of the petition in this cause, which was long after the sister's estate had been fully administered upon and all claims filed against it were barred; that plaintiff asserted a claim against the administrator of her sister's estate "alleging" one-half of the proceeds of the certificate paid to plaintiff's sister by defendant was due plaintiff; that on April 12, 1935, plaintiff entered into an agreement with said administrator by which plaintiff, for a good and valuable consideration, acknowledged full payment, satisfaction and accord of all claims against the estate of her sister arising out of the proceeds of the benefit certificate held by insured; that plaintiff stated in said agreement that the change in the beneficiaries was not fraudulent or wrong but was proper; that plaintiff did not notify defendant that she was asserting any claim against it until long after April 14, 1935, the date on which all claims against the estate of her sister were forever barred; that by virtue of plaintiff's conduct in electing to hold the estate of her sister for one-half of the proceeds of the certificate and in compromising said claim with the administrator of her sister's estate, and "in standing by and allowing the time in which to file demands against the estate of Edna Smith Carroll Eisman to elapse before notifying the defendant of any claim asserted against it, the plaintiff is now estopped from claiming or asserting any claim against this defendant for any of the benefits arising out of the membership

of Joseph M. Smith in the defendant society or of any benefit certificate issued to him which had been delivered to the defendant and canceled and in defendant's hands, or for any claim whatsoever against the defendant.''

Defendant's fifth, sixth and seventh defenses are based on the Statute of Limitations.

Plaintiff filed a verified reply in which she denied that insured endorsed thereon a request that said certificate be canceled and that a new certificate be issued in lieu thereof, in the amount of $3000, payable to her sister; denied that the beneficiaries in the certificate sued upon had been changed by the insured; denied that plaintiff executed the alleged release pleaded in defendant's answer, and alleged that the purported release was wholly without consideration and concluded with denying each and every allegation contained in defendant's answer.

At the trial plaintiff offered in evidence the file number of the original petition sued on showing that the suit was filed on October 30, 1935. She then rested her case ''under the pleadings.'' Defendant then offered a peremptory instruction, which was refused. Thereupon, defendant introduced evidence based upon its affirmative defenses, and at the close of the evidence again offered a peremptory instruction, which was likewise refused. Plaintiff also offered a peremptory instruction.

The evidence shows that plaintiff's father became a member of the society, through its local camp located at Blairstown, on January 11, 1899, at which time he took our a benefit certificate in the sum of $1000; that later he increased said certificate to $3000; that all assessments levied against this certificate were paid and he remained a member of that camp although, during all of the times that the matters material to the issues in this case transpired, he and his daughters lived in Kansas City; that insured changed the beneficiaries in his certificate several times prior to August 20, 1923, when he made application to have plaintiff and her sister made beneficiaries in the sum of $1500 each; that defendant issued a certificate in accordance with this application; that shortly thereafter insured handed the certificate to plaintiff, who, in turn, handed it to her sister to be kept by the latter; that when the certificate was delivered over to plaintiff and her sister by their father he told them that, since they were to benefit by it, it was no more than right that they should pay the assessments; that thereafter the certificate remained in the possession of the sister, who paid the assessments to the Camp Clerk at Blairstown, plaintiff furnishing one-half the amount thereof.

In support of its defenses defendant introduced in evidence the deposition of one J. G. Ray, its chief administrative officer, who gave a history of the insurance with the changes in the amount thereof and the persons designated as beneficiaries. He testified that the

benefit certificate sued on was surrendered with a request endorsed on the back thereof for a change in the beneficiaries in favor of plaintiff's sister as the sole beneficiary, said request being dated September 2, 1924; that a substitute certificate was issued to insured on September 13, 1924, payable to plaintiff's sister as the sole beneficiary in the amount of $3000. He also testified to the receipt of the proofs of death upon the substitute certificate, made by plaintiff's sister, and the payment of the full amount of the certificate, to-wit, $3000, to the sister.

Defendant also introduced in evidence certain of its by-laws, the pertinent parts of which will hereinafter be discussed.

Plaintiff contends that the insured's signature on the request for the change in beneficiaries on the back of the certificate is a forgery.

The insured did not execute the surrender clause, if he did at all, in the presence of the camp clerk, but the defendant's evidence tends to show that he executed and acknowledged it before a notary public in Kansas City. The notary so testified, although his testimony is not very satisfactory on this point.

The testimony of the Camp clerk was not available because of a paralytic stroke suffered by him sometime before the trial. However, his daughter, who had kept the camp books for him for a number of years, testified, on behalf of the defendant, that the last change in the beneficiaries, or the one occurring on September 13, 1924, followed the usual course according to the books, the certificate with the surrender clause, purporting to have been executed by the insured and acknowledged before a notary public, having been sent to the camp clerk at Blairstown.

A few days after the death of the insured, plaintiff's sister submitted proofs of death, duly executed, accomplished by the certificate dated September 13, 1924. These death proofs contained, among other things, an affidavit of the claimant, plaintiff's sister, claiming the full $3000 benefit. This affidavit was duly signed and acknowledged by plaintiff's sister. There was another affidavit attached to the proofs of death, which showed the age and occupation of the insured. This affidavit was executed by the plaintiff, herself.

The notary public, who took these acknowledgments, testifying for defendant, stated that they were taken in a restaurant where both plaintiff and her sister were present; that both affidavits were made at the same time; that he did not remember whether he made plaintiff acquainted with the contents of the affidavits, "but we were all there together and we all worked them out together." There is nothing in the evidence of this witness showing that plaintiff knew the contents of her sister's affidavit, or that plaintiff knew the sister was claiming the insurance, or that the substitute certificate or any other certificate was mentioned in the hearing of plaintiff. The statement

of the witness, without more than that "we" worked "them" out together, had no evidential value.

About a month after she received the $3000 plaintiff's sister died. Letters of administration on her estate were duly issued to her husband, Izzie Eisman, on March 26, 1934. On April 14, 1935, all claims against the estate of plaintiff's sister were forever barred under the laws of this State. Plaintiff first notified defendant of her claim on September 24, 1935, when it received a letter from Meyer & Smith, her then attorneys. In this letter defendant was made acquainted with the forgery. Defendant introduced evidence tending to show that on the 12th day of April, 1935, plaintiff executed and delivered to Izzie Eisman, administrator of the estate of her sister, an instrument headed "Receipt and Release." The first part of this instrument purports to be a release of plaintiff's claim against the estate of her sister. It sets forth that plaintiff was claiming that the proceeds of the certificate were wrongfully paid to her sister by reason of a wrongful and fraudulent change in the beneficiaries; that for the consideration of One Dollar and other good and valuable consideration, plaintiff acknowledges full payment, satisfaction and accord of all claims and demands of every kind and character which she had against the estate of her sister arising out of the payment of the proceeds of the certificate by defendant to her sister and "change in beneficiary designated in said policy, or from any other cause or source whatsoever. . . . The undersigned, Bessie Foster, does hereby state that the change of beneficiary in the policy of Modern Woodmen of America was not fraudulent or wrongful, but was legal and proper in every respect." The instrument then recites that "by way of further consideration" Izzy Eisman agrees to loan the plaintiff the sum of $100 to be evidenced by her promissory note signed by her in his favor; that Eisman shall have a lien for the payment of the note upon the interest of plaintiff in certain real estate located in Howell County, comprising a part of the estate of her father; that when the real estate is sold the loan shall be paid out of a portion of the proceeds of the sale. The instrument authorizes Eisman to pay said sum of money out of said proceeds.

This instrument was prepared by Eisman's attorney and executed, according to defendant's testimony, in the office of the attorney, the persons there present being Eisman, his attorney, plaintiff and a stenographer.

In rebuttal plaintiff testified that, after she delivered possession of the certificate to her sister, the latter retained it and the witness did not thereafter see it; that she did not know of any proposed change in the beneficiaries until after the death of her sister. She testified that the purported signature of the insured upon the certificate asking for a change in beneficiaries from herself and her sister, making her sister the sole beneficiary, was not the signature of her father.

She further testified that her sister was a business woman; that her sister had always attended to any kind of business there was to be attended to; that the witness trusted her "to do all business . . . . and anything there was to do;" that when her father died she knew the insurance was coming to her and her sister; that she knew that she was entitled to one-half of it and her sister told her that she had attended to the matter of collecting the witness' $1500 coming to her from defendant. She admitted that she signed some papers for her sister in a restaurant when the notary public, who testified for defendant, was present, but she denied that she signed any papers in connection with the proofs of death of her father; that what she signed "were administrator papers" so her sister could be appointed administratrix of her father's estate; that at that time she saw no papers making her sister the sole beneficiary under the certificate. When shown the signature to the affidavit as to the age and occupation of her father, she admitted that the signature attached thereto was hers but stated " the only thing she signed that day was supposed to be administrator papers . . . as far as that is concerned, I don't know anything about no proof of death. I never heard of it before." As before stated, plaintiff testified that her sister, at no time, told her that the sister was the sole beneficiary of the insurance.

Plaintiff testified that she had a conversation with her sister a short time prior to the latter's death, about the money due under the certificate. "I kept naturally asking her when we would get our money and so finally she told me that she had received the money, all of it, and as soon as she was well she would see that I got my part, but my sister died. Q. Did she tell you that there had been any change of beneficiary under that policy? A. No, sir. Q. When did you first discover that there had been a change of beneficiary under that policy? A. Well, it was, I should judge, around six or eight months after my sister died. Q. Six or eight months after your sister's death? A. Yes, sir. Q. How did you come in possession of that information then? A. Well, I kept, my brother-in-law received the money and I kept asking him for my part of the money and he kept putting me off, and around that time he told me I didn't have any money coming, that he had the policy changed to my sister and that I didn't have any money. Q. That was Izzy Eisman you are talking about? A. Yes, sir. Q. And he told you that he had had the policy changed to your sister? A. Yes, sir. Q. And that you didn't have any money coming? A. Yes, sir. Q. What did you do after that? A. He said he had the policy changed, so I went to see a Mr. Hill (an attorney) and asked him to get me a copy of the policy so I could see whether it was;" that Mr. Hill caused another attorney in his office to write defendant a letter dated November 19, 1934, stating: "one of the heirs of the late Joseph M. Smith, who until his death was a member of your camp at Blairstown, Missouri, is seeking to verify the change

of beneficiary which was made some ten years prior to Mr. Smith's death. Will you please forward the policy to your agent or attorney in this city for our inspection, and oblige?'' Defendant did not forward the certificate, but on November 20, 1934, sent to the attorney a photostatic copy "of the last two changes in the beneficiary in this . . . certificate."

Plaintiff testified that when Mr. Hill received this copy she did "Nothing right then. I didn't know what to do. I just wanted to get a copy of it to see if it was changed. Q. Did you employ Mr. Hill as your attorney in that matter? A. No, sir. Q. Who was the first attorney you employed? A. Anthony Nugent. Q. And when did you employ Mr. Nugent? A. It was right after that. Q. Right after you talked to Mr. Hill? A. Yes, sir. Q. What, if anything, did Mr. Nugent do by way of collecting this policy? A. Well, he didn't do anything;" that thereafter she employed Meyer & Smith, attorneys to represent her; that when she employed them they wrote defendant notifying it of her claim and asking payment thereof from it; that this was the first notification she had given defendant. As before stated, the letter of Meyer & Smith to defendant, notifying it of plaintiff's claim, was dated September 24, 1935.

Plaintiff further testified that the reason she did not notify defendant of her claim when she found out that her sister had collected all of the money was because she thought her sister would pay her; that it was over a year after her sister died before Meyer & Smith wrote defendant about the matter; that her father lived with her sister for quite a while after the certificate was turned over to her sister and that the witness had absolute confidence in her sister and "let her keep the policy;" that she had the utmost confidence in her sister's promise to give her one-half of the proceeds of the certificate had her sister lived.

With reference to signing the instrument headed "Receipt and Release," dated April 12, 1935, plaintiff testified that she had an arrangement to borrow $100 from Mr. Eisman; that she talked to Eisman about it before she was called over the telephone to come to his attorney's office; that she then went to the office; that she was blind in one eye "and could hardly see out of the other;" that she was unable to read ordinary printing or typing; that when she arrived at the attorney's office Eisman "handed me, he said, 'Here is a check for $100' and, he said, 'Here is the mortgage paper that I would have to sign, this was our agreement to get the $100;'" that only Eisman, his attorney and the office stenographer were present; that she was not there when the paper was dictated to the stenographer; that everything was ready when she got there; that the papers were not read to her; that Eisman said it was a mortgage paper and told her to sign it; that "I didn't know where to sign it, I couldn't see where to sign it, and Izzy Eisman put his finger down and I signed it

where he said to sign. Q. Did you make more than one signature? A. Well, yes, I think I did. It was just the one thing, though. Q. Was Mr. Nugent there at that time? A. No, sir, he wasn't. Q. Was anything said to you by either Mr. Friedman or Mr. Eisman or by anybody else to the effect that you were signing a release of your sister's estate, your father's estate or the Modern Woodmen of America? A. It wasn't even mentioned. That wasn't brought up at all;'' that Mr. Nugent came in later and said to plaintiff, '' 'Do you know what you are doing,' and I said, 'Yes, sir, I do. I am borrowing $100 on my farm,' and that is all that was said. Q. And that was all he said to you at that time? A. Yes, sir. Q. Did he remain in the room when you left? A. Yes, sir. I then left.''

Mr. Nugent, testifying for defendant, stated that he was employed by plaintiff to assert her claim against the estate of her sister; that he was not present when she executed the ''Receipt and Release;'' that she had executed it before he arrived at the office of Mr. Eisman's attorney; that the only reason he went there was to release his attorney's lien; that he filed no claim against the sister's estate; that when he arrived at Eisman's attorney's office he read the ''Receipt and Release'' and he assumed that plaintiff had read it; that plaintiff had settled the matter ''behind my back'' and he stated to her, '' 'I am no longer your lawyer, as I take it, yet I just want to know if you know what you are doing,' and she said she did;'' that Eisman paid him ''$20.00 to release the lien and I said, 'it won't pay me for what I have done, but I will take it.' ''

Eisman's attorney testified that plaintiff read over the instrument and signed it while Nugent was present; that nothing was paid her at that time except the $100, which was loaned by Eisman to her. This loan was later repaid.

Eisman did not testify.

Defendant obtained its Instruction ''C,'' reading as follows:

''The court instructs the jury that the evidence in this case is undisputed, that Joseph M. Smith was a member in good standing of the defendant society at the date of his death, and that the defendant has paid the full amount of the insurance to Edna Smith Carroll Eisman after death proofs were furnished it. The court instructs the jury that if you find from the evidence that the plaintiff participated in making said death proofs by making affidavit of the age of her father, if you so find, and if you further find that the plaintiff at said time knew, or by the exercise of ordinary care, could have known that her sister was claiming the full amount of said benefits, if you so find, and if you find that after her sister had received the full amount of said benefits she informed the plaintiff of that fact and promised to pay her one-half of said amount, if you so find, and that shortly thereafter her sister died and letters of administration were taken out on her estate, if you so find, and that the plaintiff thereafter demanded

of the administrator of said estate one-half of said benefits, if you so find, and that thereafter she executed the release introduced in evidence, if you so find, and did not notify defendant of the fact that she claimed one-half of said benefits until long after her sister's death and after she had executed the release read in evidence, if you find that she executed said release, and did not institute suit against the defendant until after her sister's estate had been finally closed, if you so find, then your verdict must be for the defendant.''

This instruction was undoubtedly erroneous. It ignored the important question whether the purported change of beneficiaries was the result of forgery; gave undue prominence to act of plaintiff which occurred after the $3000 was paid to her sister, none of which would work estoppel.

It has been said that estoppels are not favored; that they are odious, and will not be lightly invoked. [S. S. Allen Grocery Co., 192 Mo. App. 476, 182 S. W. 777.]

In the instant case there was no estoppel unless, among other things, it was shown the conduct of plaintiff caused defendant to change its position or caused it injury. [Blodgett v. Perry, 10 S. W. 891; Acton v. Dooley, 74 Mo. 63; Baldwin et al. v. Scott County Milling Co., 122 S. W. (2d) 890, 896; 21 C. J. 1060.] We do not find any evidence in the record tending to show the conduct of the plaintiff caused the defendant to pay the $3000 to plaintiff's sister. In the absence of such evidence there was no estoppel.

The defendant contends that, regardless of any error committed in the reception of evidence, or in giving instructions, the court erred in granting plaintiff a new trial for the reason its request for directed verdict, offered at the close of the evidence, should have been given. In support of this insistence the defendant presents several reasons, one of which is that conceding the signature of the insured to the surrender clause was a forgery, the plaintiff, when the $3000 was paid to her sister, had two remedies available to her and that these remedies were inconsistent; that one of the remedies was to have ratified the payment and asserted a claim against the estate of the sister; the other, to have repudiated the payment and sued the defendant for the $1500; that plaintiff chose to assert claim against the sister's estate. The evidence does not warrant the contention that plaintiff asserted a claim against the estate of her sister as charged in the fourth affirmative defense. She consulted attorneys regarding her rights, but there the matter ended. Even if she had filed a claim against her sister's estate, such conduct would not have barred the present action unless she had prosecuted the same final judgment or had benefited therefrom. [Johnson-Brinkman Commission Co. v. Missouri Pac. Ry. Co., 126 Mo. 349, 28 S. W. 870; Waugh v. Williams, 119 S. W. (2d) 22, 226; Otto v. Young, 127 S. W. 9.]

Defendant further insists that plaintiff and insured were negligent

before the insured's death and that such negligence bars recovery in this action. In support of this contention the defendant relies upon the fact that the insured delivered the certificate to plaintiff and that she, in turn, handed it to her sister for safe keeping. Negligence is a positive wrong, a breach of duty. It should not be said insured was under duty to the defendant to keep the certificate in his own possession in order to prevent forgery of his name to the surrender clause when he had no cause to suspect such a crime would be committed. The plaintiff was almost blind; she had confidence in her sister; each had the same interest in the certificate as the other, and neither had a vested right in the insurance. There is nothing in the record indicating, even remotely, that plaintiff was guilty of a wrong when she trusted her sister to safely keep the certificate. When plaintiff delivered the certificate to her sister the latter did not have or appear to have any right therein which she did not have while the instrument was in the possession of the insured. In other words, possession of the certificate was not in itself evidence that the possessor had right therein. In such circumstances the rule that where one of two innocent parties must suffer by the act of a third, he who has enabled such third person to occasion the loss must sustain it, does not apply. [21 C. J. 1172, 1173.] Whether the rule would be otherwise if the one in possession of the certificate had or appeared to have right or authority to change its terms, is a question not presented in the record.

The defendant further claims that the acts and omission of plaintiff after the alleged fraud had been committed on her, bars a recovery herein; that her conduct has all the elements of a pure equitable estoppel. In support of this contention defendant calls attention to the fact the certificate upon which payment was made by defendant to plaintiff's sister was issued more than nine years prior to insured's death; that during all that time plaintiff paid one-half of the dues and assessments to her sister, did not look at or examine the certificate; that after the death of her father she made no claim upon defendant for one-half of the insurance, although she testified in effect she was claiming one-half from the time her father died. The defendant further says plaintiff participated in making the proofs of death, actually assisted her sister in collecting the $3000, when she knew, or, in the exercise of ordinary care, could have known the sister was claiming the full amount of the insurance; that defendant would not have paid the $3000 to plaintiff's sister without the death proof which plaintiff helped to make; that soon after plaintiff's sister received the $3000 she died and administration was had on her estate; that plaintiff had notice of the forgery before the time for proving claims against her sister's estate had expired, and that she did not impart that information to the defendant; that if she had, on the death of her father, advised defendant of her claim, it would have

interpleaded; that if plaintiff had notified defendant of her claim before her sister's estate was closed, it would have had an opportunity to recover from the estate the $1500 now claimed by plaintiff; that plaintiff did not notify it of her claim until some five months after the estate of her sister had been closed; that plaintiff not only failed to notify defendant of her claim, but that she actually entered into the "receipt and release;" that plaintiff's acts were "both negligent and deliberate—a basis for an estoppel; but she is also estopped herein because of her silence while permitting the appellant to pay her sister the full amount although she was claiming one-half thereof, and because of her silence until claims against her sister's estate were barred."

These contentions are based in part, at least, upon deduction in conflict with plaintiff's evidence. According to plaintiff she did not assist her sister in collecting the $3000; that she believed the affidavit she signed was in connection with the administration of her father's estate; that nothing was said about insurance or that her sister was claiming to be sole beneficiary. While she testified she signed the "receipt and release," she also testified in effect that her signature to that somewhat remarkable document was obtained through trickery. The evidence of both parties shows the "release" was not supported by any consideration. It must be borne in mind that the loss was sustained when defendant paid the $3000 to plaintiff's sister; that plaintiff had not prior to that time (or any other) made any false representations to the defendant; that she did not know of the forgery or that her sister was claiming the full amount of insurance until after the loss was sustained; that there is no evidence the affidavit made by plaintiff caused defendant to pay the $3000. On these facts there was no estoppel. [Northrup v. Colter, 150 Mo. App. 639, 131 S. W. 364; Palmer v. Welch, 171 Mo. App. 580, 154 S. W. 433; Wilkinson v. Lieberman, 37 S. W. (2d) 533.]

Defendant contends its Instruction "G" was a proper one, and that the court erred in granting a new trial on the ground it was erroneously given. The defendant argues plaintiff adopted its Instruction "G" by obtaining her Instruction No. 1 as follows:

"The court instructs the jury that your verdict must be for the plaintiff, Bessie I. Foster, and against the defendant, Modern Woodmen of America, in the sum of $1500.00, and you may allow 6 per cent interest thereon from the date of the filing of this suit, to-wit: October 30, 1935, unless you find and believe from the preponderance or greater weight of the credible evidence in the cause that the insured, Joseph M. Smith, changed the beneficiary under the certificate of membership in question from plaintiff and her sister to her sister alone, or that plaintiff is estopped from claiming or asserting any claim against the defendant on said certificate of membership as submitted in these instructions, and this is true even though you may

find and believe from the evidence that the defendant has already paid the full amount of the benefits in question to plaintiff's said sister.''

The claim is that the words in the instruction, ''or that plaintiff is estopped from claiming or asserting any claim against the defendant on said certificate of membership as submitted in these instructions, . . .'' referred to and adopted defendant's Instruction ''G'' as being a proper one on the question of estoppel. Instruction No. 1 did not specifically mention Instruction ''G.'' The latter instruction merely told the jury that upon finding the facts therein hypothesized the verdict would be for the defendant, and did not say that if said facts were true then plaintiff was estopped to maintain the action.

The record discloses that plaintiff requested Instructions numbered 1 to 7, inclusive; that Instruction No. 1 was given and the others were refused, and that defendant excepted to the giving of Instruction No. 1; that ''thereupon'' defendant requested the court to give 10 instructions, among which was Instruction ''G.''

It is common practice, as we know, for both litigants to pass their requested instructions to the trial judge at the same time, but we cannot infer such practice was followed in the instant case in face of the affirmative showing that defendants Instruction ''G'' was not considered or requested until after plaintiff's Instruction No. 1 was given. [Peoples Bank of Queen City v. Aetna Casualty & Surety Co., 40 S. W. (2d) 535, 541.] As the trial judge at the time he gave Instruction No. 1 had not been requested to give Instruction ''G,'' we should not say the former instruction adopted the latter. We think, when the record is considered, the most reasonable view is that the phrase referring to estoppel, ''as submitted in these instructions,'' is ambiguous and to the lay jurors meaningless. However, be this as it may, it is not, nor could it be claimed, Instruction No. 1 adopted that part of Instruction ''G'' which told the jury ''that the evidence in the case is undisputed . . . that the defendant has paid the full amount of the insurance to Edna Smith Carrol Eisman after death proofs were furnished it.'' The ''undisputed'' evidence was that defendant had paid the plaintiff's sister the amount called for in the certificate dated September 13, 1924, and not that it had paid the ''full amount'' or any amount in discharge of its obligation under the contract on which this action was based. The instruction probably caused the jury to believe the court told it the ''full amount'' of the insurance involved in this action had been paid when in fact no part of the insurance plaintiff sought to recover had been paid. Thus, regardless of the question of adoption, the instruction was misleading and erroneous.

The plaintiff's motion for new trial assigned that the court erred in admitting certain testimony; and erred in giving and refusing

instructions. If any of these grounds were well founded, then the order awarding a new trial should be affirmed even though plaintiff was not in position to claim defendant's Instruction "G" was erroneous. The evidence which the plaintiff claims was erroneously admitted was that of the defendant's witness Ray. In his deposition was the following question and answer: "Q. How did this substitute benefit certificate come into your possession? A. It was surrendered by Joseph M. Smith with a request endorsed on the back thereof for a change of beneficiary in favor of Edna Smith Carrol, (plaintiff's sister) daughter, as sole beneficiary, said request being dated September 2, 1924." Upon plaintiff's objection to the question based on numerous grounds, the court struck the words, "by Joseph M. Smith," and permitted the answer to be received in evidence with those words deleted therefrom. The question was a plain and proper one; it called upon the witness to state how he received the certificate, which was then in his possession. As we understand the record, the defendant concedes that the certificate was sent to it through the mail by its local camp clerk at Blairstown. If the answer had been responsive to the question the witness would have said the certificate came to him through the mail. Instead of making such statement he so framed his answer that it appears to be based on his personal knowledge, when in truth he had no such knowledge. When the fact that the witness lacked personal knowledge is considered, it is apparent the answer was a conclusion. But as the objection was to the question, not the answer, the point is ruled against plaintiff.

The plaintiff's requested Instruction No. 6, which the court refused, follows:

"The court instructs the jury that defendant is not entitled to a verdict under or upon its fourth affirmative defense wherein it is charged that plaintiff elected to hold the estate of Edna Carrol Eisman for one-half of the proceeds of the benefits in question and compromised said claim with the administrator of said estate, and that she stood by and allowed the time in which to file demands against the estate of Edna Smith Carrol Eisman to elapse before notifying defendant of her claim, and that defense is, therefore, withdrawn from your consideration."

The allegations in the fourth affirmative defense have hereinbefore been stated and need not be repeated.

Even if the allegations were sufficient to state a defense, they should have been withdrawn for the reason they were not supported by proof. The evidence for the defendant, as well as that of plaintiff, shows plaintiff did not assert a claim against her sister's estate "alleging" that one-half of the proceeds of the certificate was due her. The evidence of both parties disproved the allegation that plaintiff received consideration for signing the so-called release releasing her claim against the sister's estate arising out of the proceeds of the

certificate. Permitting that defense to remain in the case would tend to confuse the jury, and may have induced it to believe the defendant's evidence offered on that defense had value. The instruction should have been given.

We have concluded the record discloses facts not hereinbefore discussed which warranted the court in refusing to direct verdict for the defendant. These facts are: Joseph M. Smith became a member of defendant's camp at Blairstown, Missouri, and received a certificate in the amount of $1000, in which his wife was beneficiary, on January 19, 1899. Thereafter, four substitute certificates were issued, dated respectively, as follows: November 8, 1911; July 7, 1914; September 15, 1920; September 13, 1923. The substitute certificates effected a change in beneficiary and increased the insurance to $3000. In all other respects they were the same as the original certificate. Each change of beneficiary was made in strict compliance with the contract. On each of the last mentioned certificates, following the signatures of defendant's chief officers, there was a printed statement to be filled in by the camp clerk, stating therein the date when the certificate was delivered. Following this was a line or lines *in print* to be signed by the insured in which it was stated in substance that he accepted the certificate and agreed to be bound by all of the conditions thereof. Each of said five certificates shows the camp clerk signed at the place provided for his signature and stated therein the date of delivery. The certificate, dated September 13, 1924, beneath the signatures of said chief officers, reads as follows:

"Certificate delivered this 16th day of September, 1924.

"A. L. Chandler, Clerk,

"Camp No. 2888, M. W. of A.

"I have read, and hereby accept, the above benefit certificate, and agree to all the conditions therein contained and referred to.

"Signature of Member."

Defendant's by-laws, section 47, in force during the entire year 1924, follows:

"Sec. 47. Change of Beneficiary. Assignment of Benefits. Any member in good standing who desires to change his beneficiary shall execute the surrender clause on the back of his Benefit certificate designating therein the change desired, and deliver said certificate, together with a fee of 50 cents, to the Camp Clerk. The execution of such surrender clause shall be in the presence of, and be attested by, his Camp Clerk. If the member be so situated that he cannot execute said surrender clause in the presence of his Camp Clerk, his acknowledgment thereto may be taken by any person authorized by law to administer oaths and the same shall then be forwarded to the Clerk of his local Camp. The local Clerk shall deposit one-half of said fee of 50 cents in the General fund of the Camp and forward said cer-

tificate and the remaining half of said fee to the Head Clerk, who shall thereupon issue a new Benefit certificate payable to the beneficiary named in said surrender clause, subject to the provisions of Section 45 hereof, and deposit the fee of 25 cents in the General fund of the Society. No change in the designation of beneficiary shall be effective until a new certificate has been issued by the Head Clerk and within the lifetime of the member. Any attempt by a member to change the payee of the benefits of his Benefit certificate by will or other testamentary document, contract, agreement, assignment, or otherwise than by strict compliance with the provisions of this section shall be absolutely null and void. Any agreement entered into by the member by the terms of which he attempts to assign the benefits or any portion thereof agreed to be paid under the certificate to any other person than the beneficiary designated in the certificate shall be absolutely void. Any agreement entered into by a member not to change his beneficiary shall be null and void.''

This by-law was a part of the contract of insurance; it was competent for the defendant to provide, as it did, that no change in the designation of beneficiary would be effective until a new certificate was issued; that any attempt by a member to change the beneficiary otherwise than by strict compliance with the by-laws was ''absolutely null and void.'' The defendant transmitted the certificate dated September 13, 1924, to its said camp clerk and he endorsed thereon a statement that he delivered it September 16, 1924. That statement, however, does not prove itself. There was no evidence showing the whereabouts of the certificate from the time the clerk received it until after the death of the insured. There was no showing one way or the other whether the defendant in a by-law prescribed the form of its certificates, nor showing whether a certificate was or was not effective until the member endorsed his acceptance thereon. However, the certificates show that from 1899 to 1923 it was the defendant's custom to require the member to sign the printed statement, evidently prepared and furnished by it, as a part of the certificate, and in which the member stated that he accepted the certificate and agreed to its terms. In other words, defendant conducted its business in a manner clearly indicating it did not consider the contract complete until the member had signed the acceptance provision. We conclude the jury from these facts could find that the certificate of September, 1924, was not a completed contract; that the attempt to change the beneficiaries in the certificate of September, 1923, was ''null and void.''

In this connection it must be remembered the defendant, when it paid the $3000 to plaintiff's sister, had all of the certificates before it; that the acceptance of the insured was endorsed on each certificate except the last. It, therefore, knew the insured had not signified acceptance of the certificate in the manner it had provided.

The conclusion is inescapable that if the defendant had required the

member to sign the acceptance provision in the questioned certificate, according to its custom, the forgery (assuming there was a forgery) would have been discovered.

The defendant claims plaintiff's cause of action was barred by the five-year Statute of Limitations, Section 862, Revised Statutes 1929, because the certificate sued upon was cancelled on September 13, 1924, and a substitute certificate delivered on September 16, 1924, and this action was not brought until October 30, 1935. Defendant argues, "if the cancellation was wrongful and fraudulent, it was a wrong and fraud upon Smith, who had the absolute right to designate his beneficiary;" that the statute was put in motion when the substitute certificate was delivered. This argument assumes the member received the certificate and knew of the forgery. There was no evidence the member knew of the forgery, and we cannot say as a matter of law the certificate was delivered.

There was no evidence tending to show the insured had cause to believe his name would be forged to the request, and having no cause to suspect that such a crime would be committed, he was not required to investigate. [Monmouth College v. Dockery, 241 Mo. 523, 145 S. W. 785.]

Plaintiff had no cause of action until her father died. It follows this action was timely brought. [Lewis v. Thompson, 96 S. W. (2d) 938.]

The order awarding a new trial is affirmed. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The order awarding a new trial is affirmed. All concur.