Because I believe that the trial court should have directed a verdict in favor of AmSouth, as requested by AmSouth, on the fraudulent concealment count and because I do not believe that punitive damages are appropriate in this case, I dissent. The majority predicates its opinion on the fact that this is no ordinary banking case and that the particular circumstances of this case would rarely, if ever, reappear. Hard facts have been known to make bad law.
 Fraudulent Concealment
Section 6-5-102, Code 1975, provides:
 "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
A bank and its depositor stand merely in a debtor-creditor relationship, not a confidential relationship. Reynolds v.McEwen, 416 So.2d 702 (Ala. 1982); Southern Hardware SupplyCo. v. Lester, 166 Ala. 86, 52 So. 328 (1910). This principle has been entrenched in the law of Alabama since at least 1910; it has been applied as recently as 1984 in the case of Baylorv. Jordan, 445 So.2d 254 (Ala. 1984). In Baylor, this Court affirmed a summary judgment for a bank on a customer's claim of fraudulent concealment because the bank did not owe the customer a duty to disclose. Justice Faulkner, writing for a division of this Court, stated:
 "Courts have traditionally viewed the relationship between a bank and its customer as a creditor-debtor relationship which does not impose a fiduciary duty of disclosure on the bank. . . ." 445 So.2d at 256
Therefore, there is no confidential relationship between the bank and Spigener and the bank/customer relationship would not be a particular circumstance which would impose a duty of disclosure on the bank.
The majority in this case holds that some or all of the following "particular circumstances" may impose a duty on a bank to contact a customer before it honors a valid negotiable instrument bearing the customer's genuine signature and his explicit, unconditional order to pay:
(1) The presentation of an old form counter check bearing a current date with no account number on it (these are particular circumstances one through five, and twelve, as set out by the majority). Would this alone impose this duty? What if the customer customarily carried and used counter checks, as Spigener did? Would *Page 1043 
that make a difference? If so, are we imposing upon banks the duty to ascertain a customer's past banking practice or to contact the customer before honoring a valid negotiable counter check containing an explicit unconditional order to pay? What if the counter check is the kind of counter check currently being used by the bank? Does this make a difference?
(2) The payee of the check is an ex-spouse (this is the essence of particular circumstances six, seven, and thirteen). Would this alone impose such a duty on a bank? What if the drawer of the check still lived next door to the ex-spouse? Spigener and Ferguson lived next door to each other at the time the check was honored. Would this affect what the bank must do? Are we then imposing upon a bank the duty of ascertaining the relationship between the payee and the drawer of a valid negotiable instrument bearing the drawer's genuine signature and his explicit, unconditional order to pay, and the duty of contacting the drawer if the relationship between the drawer and the payee is out of the ordinary?
(3) Part of a check is typed and the other part is written in different handwriting or written in different colored ink (these are the majority's particular circumstances eight through ten). Does this alone impose such a duty on a bank? What if the drawer customarily signed a check and had the payee or another fill in the rest of the check, as Spigener frequently did? Would that affect the duty?
(4) The check was for a large amount (larger than checks customarily written — particular circumstance eleven). Would this alone impose such a duty on a bank? If so, how much larger must the check be: twice as large as the amount of the checks customarily written? $5, $50, $500, more?
(5) The bank's attorney, who was contacted by bank officials and asked if the check should be honored, had represented the drawer of the check in his divorce against the payee of the check. Would this particular circumstance alone impose on the bank the duty to disregard its attorney's advice and require it to contact the drawer of the check before honoring it?
(6) The payee of the check appeared before high ranking bank officials on presentment of the check. Does this particular circumstance alone impose a duty on the bank to call the drawer before honoring a valid negotiable instrument containing the drawer's explicit, unconditional order to pay?
If none of these particular circumstances alone imposes this duty, what combination imposes such a duty?
What if the drawer of the check cannot be contacted? Is not the bank in a "Catch 22"? If it honors the check, it is for the trier of fact to determine if the bank is guilty of fraudulent suppression; if it refuses to honor the check it is for the trier of fact to determine if the bank is guilty of wrongful dishonor.
The risk of loss from the payment of a check signed in blank must be placed on the drawer of the check.
In S.S. Allen Grocery Co. v. Bank of Buchanan County,192 Mo. App. 476, 182 S.W. 777, 781 (1916), the following appeared:
 "Every consideration of justice and common sense sustains the conclusion that a depositor should affix his signature to a blank check only for the purpose of directing the bank to pay out the money, and that the risk of signing and then keeping a blank check, whether the keeping be careful or negligent, should be a risk the maker voluntarily assumed. . . . If the exigencies of the depositor's situation create a necessity for the signing of checks in blank, and then keeping them a time before putting them into circulation, why should he not bear the risk made by his own necessities, rather than the banker, who is a stranger to them, and is under the contractual duty to honor his written orders for the payment of money?"
When a bank customer signs a blank check using the customary signature on file at the bank, and a third party obtains possession of this check and completes it, *Page 1044 
the check becomes a valid negotiable instrument containing an explicit, unconditional order to pay. The bank customer must know that the bank on which the check is drawn will honor this check when it is presented in the regular course of commerce. If payment has not been stopped on it, the mere fact that such a check will be paid when presented cannot be the basis for an action of fraudulent suppression.
Where a defendant files a motion for directed verdict as to a count that is not supported by the evidence, detailing with specificity the grounds upon which the particular count is not supported by the evidence, and the Court denies the motion, a general jury verdict will not be assumed to have been returned on account which is supported by the evidence. RussellvilleProduction Credit Ass'n v. Frost, 484 So.2d 1084 (Ala. 1986);Old Southern Life Ins. Co. v. Spann, 472 So.2d 987 (Ala. 1985);City of Huntsville v. Certain, 453 So.2d 715 (Ala. 1984), cert. denied 472 U.S. 1027, 105 S.Ct. 3499, 87 L.Ed.2d 631 (1985);Cincinnati Ins. Co. v. Little, 443 So.2d 891 (Ala. 1983); JohnDeere Indus. Equipment Co. v. Keller, 431 So.2d 1155 (Ala. 1983); Ex parte Nix, 401 So.2d 64 (Ala. 1981); Aspinwallv. Gowens, 405 So.2d 134 (Ala. 1981).
At the close of Spigener's evidence, AmSouth moved for a directed verdict as to the fraudulent concealment count, with the requisite specificity; AmSouth again, at the close of all of the evidence, moved for a directed verdict as to that count, again with the requisite specificity.
 Punitive Damages
A suit for wrongfully honoring a negotiable instrument (whether alleged as fraudulent suppression, conspiracy, or under § 7-4-401, Code 1975) is in essence a suit arising out of the breach of a contractual relationship between the bank and its depositor. Sherrill v. Frank Morris Pontiac-Buick-GMC,Inc., 366 So.2d 251 (Ala. 1978). This Court has held that punitive damages are not recoverable for breach of contract outside the insurance context. Kennedy Electric Co. v.Moore-Handley, Inc., 437 So.2d 76 (Ala. 1983).
Even before the UCC was enacted, it was clear that a bank could not be subjected to punitive damages for paying a check bearing the depositor's genuine signature. 9 C.J.S. Banks andBanking, § 353 at 722 (1938): "In an action . . . for illegally or wrongfully paying checks or orders, the measure of damages is the sum paid out with interest from the date of payment."
This rule was codified in § 7-4-103(5), Code 1975, which limits a bank's damages for improper payment of a check to the face amount of the check plus, in the case of "bad faith," consequential damages. Sherrill v. Frank MorrisPontiac-Buick-GMC, Inc., supra. The following cases have interpreted this UCC section, § 4-103(5), as not permitting punitive damages: Bagby v. Merrill Lynch, Pierce, Fenner Smith, 491 F.2d 192 (8th Cir. 1974); Joffe v. United CaliforniaBank, 141 Cal.App.3d 541, 190 Cal.Rptr. 443 (1983); Beir v.Manufacturers Hanover Trust Co., 110 A.D.2d 529, 488 N.Y.S.2d 1
(1985); Titan Air Conditioning Corp. v. Chase Manhattan Bank,N.A., 61 A.D.2d 764, 402 N.Y.S.2d 12 (1978); Singleton v.National Bank of North America, 43 A.D.2d 857, 351 N.Y.S.2d 722
(1974).
I am aware that there has been an increase in the number of contract cases in which punitive damages have been awarded and that Professor Gilmore contends that this is a particular illustration of a more general phenomenon: the reabsorption of contract law into the main body of tort law from which contract principles emerged more than a century ago. G. Gilmore, TheDeath of Contract 83 (1974). Whether the judicial attitude permitting recovery of punitive damages in contract cases is calculated or casual, decisions liberalizing the availability of punitive damages in contract cases have "contributed to a process of change which has greatly increased the territory occupied by Dean Prosser's shadowy borderland between tort and contract. How rapidly it may proceed and where it will ultimately lead no careful scholar can confidently predict." T. Sullivan, *Page 1045 Punitive Damages in the Law of Contract: The Reality and theIllusion of Legal Change, 61 Minn.L.Rev. 207, 252 (1977). I am for it proceeding no farther; at least not until we have formulated sufficient standards governing punitive damages awards.
When a negotiable instrument is wrongfully honored by a bank, what are our standards for permitting the drawer of the instrument to recover punitive damages? Must there be evidence of insult, or contumely, or malice (none of which is present in the case before the Court), or does the wrongful honor of the instrument in and of itself constitute legal insult, contumely, or malice sufficient to justify an award of punitive damages? We have been warned that the lack of sufficient standards governing punitive damages awards in Alabama may be violative of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. See Aetna Life Insurance Co. v.Lavoie, ___ U.S. ___, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823
(1986), wherein this argument was referred to as an important issue which in an appropriate setting must be resolved.