505 So.2d 1030 (1986)
AmSOUTH BANK, N.A., et al.
v.
Wilbur SPIGENER.
84-1150.
Supreme Court of Alabama.
September 26, 1986.
*1031 Joe A. Macon, Jr., Wetumpka, and Fournier J. Gale III, Kirby Sevier, Lee E. Bains, Jr., and Frank D. McPhillips of Maynard, Cooper, Frierson & Gale, Birmingham, for appellants.
Steven F. Schmitt of Hornsby & Schmitt, Tallassee, for appellee.
H. Hampton Boles of Balch & Bingham, Birmingham, for amicus curiae Modern Banking Assoc. of Alabama.
SHORES, Justice.
Defendant AmSouth Bank, N.A., appeals from a judgment entered pursuant to a jury verdict in the amount of $1,000,000 in favor of plaintiff Wilbur Spigener.
This suit arises out of the allegedly wrongful completion and cashing of a $25,000 check drawn on the account of Wilbur Spigener and presented by Spigener's ex-wife, Laura Ann Ferguson, at Citizens Bank of Wetumpka.
Spigener married Ferguson in 1946. Throughout the marriage, he maintained a checking account solely in his name at Citizens Bank. The account number was XX-XXXX-X.
The parties were divorced on July 7, 1970, and each was represented by an attorney. The final decree incorporated a full property settlement agreement. Spigener's attorney was Bill Reneau, who was also the attorney for Citizens Bank and chairman of its board of directors at the time of the transaction in question in this case. Ferguson contends that, shortly before their divorce, Spigener signed an undated blank counter check and gave it to her, saying that she could fill it in any time that she wanted to for any amount. She says that Spigener gave her the check for one or both of the following reasons: (1) the check was given in consideration for Ferguson's agreement not to inform the public of Spigener's misdeeds as county commissioner of Elmore County; and (2) the check was given in exchange for Ferguson's agreement not to insist upon a more generous divorce settlement. Thus, she contends that she had the authority to complete and present the check in question. This agreement was not made a part of the divorce agreement. (The trial court ruled that Ferguson could not testify or present evidence on her allegation that Spigener had committed misdeeds as county commissioner. AmSouth claims that this ruling was erroneous because it was central to its defense in that it tended to show that Ferguson had authority to complete the check. Thus, the bank argues that it could not have been held liable under any theory for honoring this check.)
Spigener denies Ferguson's version of how she obtained the check. He testified that, while they were married, he had occasionally given her signed blank checks to pay their bills. It was his contention that the $25,000 check was one of those checks. He denies that she had authority to complete the check.
On July 30, 1970, 13 days after the parties were divorced, Spigener went to the Citizens Bank and, on the advice of the bank's president, closed out checking account number XX-XXXX-X and opened a new checking account at Citizens Bank, account number XX-XX-XX-X. Spigener testified that he changed his account because he did not want his ex-wife to write any more checks against his account. This new account remained in existence through and including February 1, 1983, the day on which Ferguson presented the $25,000 check. The check in question was paid against this account. The $25,000 check did not, however, have the new account number on it at the time the check was presented for payment.
*1032 Ferguson maintained possession of this check through the 1970's and, after remarrying Robert Ferguson, she had her name typed in as the payee.
On Thursday, January 27, 1983, Ferguson, who was experiencing financial problems, called Joe Graham, senior vice president of Citizens Bank, and told him that she had a large check on a Citizens Bank account that she wanted to cash. She stated that she wanted to use the proceeds to pay off her loan with Citizens Bank. Graham told her to bring the check to the bank. There was testimony by some of the bank officials that there had been discussions about this check after Ferguson had called Graham, but prior to her presenting it on February 1, 1983.
On February 1, 1983, Ferguson went to Graham's office, where she repeated her intention to pay off her loan with the proceeds of the check. While Graham left his office to determine the balance due on the loan, Ferguson completed the check. She dated it February 1, 1983, and filled in the amount for $25,000. Graham was aware that she had completed the check that day.
Graham took the check and verified that Spigener's signature was genuine, confirmed that there was no stop payment order on the check, and verified that there were sufficient funds in Spigener's account to cover the check. Graham then sought the opinion of President Watt Jones as to whether the check should be paid. Jones examined the check and concluded that it should be honored.
Jones and Graham then called attorney Reneau to get his opinion on whether to pay the check. Reneau testified that he might have spoken to Graham and Jones several times about the check in question prior to its presentment. He thought he recalled a discussion about the check being 13 years old and whether that would affect the written date on the check. Reneau stated that he did not recall ever being told that the FDIC symbol was out of date, that Ferguson's name was typed in, that the date and amount were in handwriting different from Spigener's signature, that the check was a counter check without an account number, and that it had an out-of-date routing number. He likewise did not recall being told that Ferguson had gotten the check prior to her divorce from Spigener.
The bank officials made the decision to cash the check without contacting Spigener. Eight days later, Spigener discovered the check after receiving his monthly bank statement. He immediately contacted the bank officials, seeking an explanation.
Spigener filed suit against the bank on May 3, 1983. Subsequent to the filing of this suit, Citizens Bank merged with AmSouth Bank, N.A. AmSouth assumed all assets and liabilities of Citizens Bank.
Prior to the trial of this case, the parties agreed that three legal theories were to be tried before the jury: (1) alleged violation of Code 1975, § 7-4-401, (§ 4-401 of the Uniform Commercial Code, as adopted in Alabama); (2) fraud; and (3) civil conspiracy. All three theories were submitted to the jury, which returned a verdict in favor of Spigener and against both AmSouth and Ferguson in the amount of $1,000,000. This appeal followed.
AmSouth's arguments can be reduced to the following: (1) portions of the court's oral charge to the jury were erroneous; (2) punitive damages were erroneously awarded; (3) the trial court erred in denying AmSouth's motions for directed verdict on the fraud and conspiracy counts; (4) certain evidentiary rulings made by the trial judge were erroneous; and (5) a motion for new trial or remittitur was wrongfully denied.
Spigener contends that the bank violated § 7-4-401 when it paid the check in question. Subsection (1) of § 7-4-401 provides: "As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft." (Emphasis added.) Specifically, Spigener maintains that the check was improperly paid because it had been altered. As defined in § 7-4-104(1)(i), the term "`[p]roperly payable' includes the availability of funds for payment at the *1033 time of decision to pay or dishonor." (Emphasis added.) By its very terms this definition of "properly payable" is not an exclusive one. Wolfe v. University National Bank, 270 Md. 70, 310 A.2d 558 (1973). "The question of what is `properly payable' can be resolved by examining the deposit agreement and specific UCC provisions regulating bank/customer relationships." G & R Corp. v. American Security & Trust Co., 523 F.2d 1164, 1170 (D.C.Cir. 1975). The definition does not exclude Spigener's contention that an altered item is not properly payable. See Hanover Ins. Companies v. Brotherhood State Bank, 482 F.Supp. 501 (D.Kan.1979).
Section 7-3-115, dealing with incomplete instruments, provides:
"(1) When a paper whose contents at the time of signing show that it is intended to become an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.
"(2) If the completion is unauthorized the rules as to material alteration apply (section 7-3-407)...."
Section 7-3-407 defines any alteration of an instrument as material that "changes the contract of any party thereto in any respect, including any such change in ... (b) an incomplete instrument, by completing it otherwise than as authorized...." If in fact Ferguson completed the check without authorization, as alleged by Spigener, then there was a material alteration of the check.
Merely establishing that the check contained a material alteration is insufficient to impose liability upon the bank, according to the Uniform Commercial Code. Section 7-4-401(2) provides:
"A bank which in good faith makes payment to a holder may charge the indicated account of its customer according to:
"(a) The original tenor of his altered item; or
"(b) The tenor of his completed item, even though the bank knows the item has been completed unless the bank has notice that the completion was improper." (Emphasis added.)
Spigener contends that the bank charged his account in bad faith and with notice that the completion was improper, which he says is contrary to reasonable commercial standards of the bank's business. AmSouth denies both allegations and has asserted in defense § 7-3-406, which provides:
"Negligence contributing to alteration or unauthorized signature.

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."
These contentions were all appropriate issues for the jury's consideration.
Section 7-4-103(5), Article 4, dealing with bank deposits and colllections, prescribes that "[t]he measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence." Thus, if the check in question was not "properly payable," from Spigener's account, Spigener is entitled to a recredit of $25,000 to his account for a violation of § 7-4-401 by AmSouth, and if AmSouth acted in bad faith, consequential damages are likewise allowed. Punitive damages are not allowed under either of these UCC provisions and must be supported by the evidence offered in support of the fraudulent concealment and civil conspiracy claims to be upheld. We now turn to the issues raised by AmSouth.

I. JURY CHARGE
The trial judge began his charge to the jury by stating:

*1034 "The plaintiff has three different claims for relief in this case. He has a count of simple negligence and wanton conduct. They have a count for fraud and a count for civil conspiracy."
The judge then proceeded to define negligence, wantonness, fraud, and conspiracy, and then charged the jury that AmSouth denied all of Spigener's claims and was asserting that it had acted in accordance with the provisions of the UCC. After a discussion with attorneys for both sides, the court resumed charging the jury, as follows:
"On the complaint of simple negligence, the award of compensatory damages only is allowed. You cannot award punitive damages for a simple negligence finding. Now, you couldunder theif you find that the bank acted improperly under the provisions of the Uniform Commercial Codeand I read some of those provisions to youthat the limit of their liability would be the amount of the check on that particular account. Now, as far as the fraud and civil conspiracy counts are concerned, punitive damages would be allowable if you find that the fraud is malicious, oppressive or gross and representation made with the knowledge of the falseness, or so recklessly made as to amount to the same thing, then there could be an award for punitive damages under one of those two counts.
"Now, as I told you, the Defendants don't have to prove anything. When I mentioned the fact earlier that they said that they had acted properly under the provisions of the Uniform Commercial Code and stated that as a defense, they don't have to prove anything. The Plaintiff has the burden to reasonably satisfy you of the truth of his materialand each of the claims or any one of them, and the same would apply to Defendant Ferguson's counterclaim against the Plaintiff.
"Now, I'm going to read for you some requested instructions. I'll state to you that they are correct statements of the law, but they are not to be taken and considered by you separate and apart from what I've already said to you. Just take it and consider it along with all the other instructions that I've given you. They are neither more important nor less important than my instructions up to this point.
"...
"Under the Uniform Commercial Code in Alabama, banks, such as Citizens Bank, have the right to charge its [sic] customer's account in the amount of any check which is properly payable on the account.
"The fact that a check has been completed by someone other than the maker of the check does not in and of itself render the check not properly payable.
"In order for a check to be a valid, negotiable check, it must contain only the following: It must be signed by the maker of the check. It must contain an unconditional promise or order to pay a sum certain in money. It must be payable on demand or at a definite time and must be payable to the order of a specific person or to the bearer of the check. The check contains each of these four things; then the check is valid and negotiable unless the bank has been given notice of some alteration or irregularity.
"There is no legal requirement in Alabama that a check be written on any particular kind of paper or even that it be written on paper at all for the check to be valid and negotiable.
"The Plaintiff contends that he did not give to Laura Ann Ferguson the authority to complete the check in the amount in which it was completed or, alternatively, that he withdrew such authority before it was presented for payment.
"The Plaintiff has the burden to reasonably satisfy you of [sic] all the evidence of the truthfulness of this assertion. If the Plaintiff fails to satisfy his burden in this regard, then you must return a verdict in favor of all the Defendants.
"The Plaintiff may not recover against AmSouth Bank in this case merely by showing that Laura Ann Ferguson did not have authority to complete the check.

*1035 "It is the law of Alabama that a bank which makes payment on a check may charge its customer's account in the amount of that check even though the bank knows the check was completed after it was signed, unless the bank fails to act in good faith or has notice that the check was completed improperly.
"... The Plaintiff has the burden to reasonably satisfy you by the evidence that Citizens Bank acted in bad faith or had been notified prior to the time it was brought to the bank that the completion of the check by Laura Ann Ferguson was unauthorized. If the Plaintiff fails to satisfy his burden in this regard, you must render a verdict in favor of AmSouth Bank.
"The bank asserts as a defense in this case that the Plaintiff Wilbur Spigener himself was negligent when he signed the check in blank and gave the check to Defendant Laura Ann Ferguson and did not stop payment on the check.
"Negligence is defined as the failure to exercise reasonable care, that is, such care as a reasonably prudent person would have exercised under the same, or similar, circumstances.
"AmSouth Bank has the burden to reasonably satisfy you from the evidence that the Plaintiff himself was negligent and that his negligence substantially contributed to the unauthorized completion of the check by Laura Ann Ferguson.
"If you are reasonably satisfied from all the evidence that the Plaintiff Wilbur Spigener was negligent and that his negligence substantially contributed to the completion of the check by Laura Ann Ferguson and that Citizens Bank acted in good faith; that is to say, honesty in fact, and in accordance with reasonable commercial standards within the banking industry, then you must return a verdict in favor of AmSouth Bank.
"...
"As against his customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft.
"A bank which in good faith makes payment to a holder may charge the indicated amountindicated amount of its customer according to A) the original tenor of his item, or B) the tenor of his completed item if for the bank those items have been completed, unless the bank has notice of the completion being improper.
"Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such changes on the incomplete instrument by completing it otherwise than is authorized.
"...
"... I instruct you that the ordinary relationship between the bank and its depositor is not a confidential one but rather is a debtor-creditor relationship; out of which no duty to disclose ordinarily arises.
"There is no legal requirement that a check bear an account number to be valid and negotiable.
"There is no legal requirement that a check bear a routing transit number to be valid and negotiable.
"If you find in favor of the Plaintiff and against the bank for violating the Commercial Code, you may not award damages in excess of the amount of the check; that is, $25,000, unless you find that Citizens Bank acted in bad faith. If you find that Citizens Bank acted in bad faith, you may also award damages as suffered by Mr. Spigener as a proximate consequence."
AmSouth contends that the trial judge erred when he "unilaterally injected" the theories of negligence and wantonness. It was error, AmSouth contends, because (1) these common law theories are preempted by the UCC; (2) these theories were excluded from the pre-trial order; and (3) even if the theories were viable, Citizens Bank owed Spigener no legal duty to disclose the presentment of a check bearing his genuine signature.
Having carefully read the oral charge in its entirety, we do not find that the trial judge "unilaterally injected" two *1036 new common law theories into the trial of this case. The charge, taken as a whole, properly instructed the jury on the applicable law. We note that the court and all counsel referred to the Bank's violation of § 7-4-401 in terms of a theory of negligence. The UCC is replete with concepts of common law tort theories. Phrases such as "ordinary care," "reasonable commercial standards," and "good faith" are found throughout Articles 3 and 4 covering commercial paper and bank deposits and collections. Comment 4 to § 7-4-103 states that "[u]nder this Article banks come under the general obligations of the use of good faith and the exercise of ordinary care," and where they fail to use good faith and ordinary care, they are liable for damages, as provided for in § 7-4-103(5). Thus, courts typically discuss UCC actions involving banks in terms of negligence. It is therefore proper and necessary to instruct juries on the applicable tort concepts. Section 7-1-103, entitled "Supplementary general principles of law applicable," provides that "[u]nless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions."
Furthermore, the bank asserted the affirmative defense of contributory negligence to the claim that it violated § 7-4-401. It relied on § 7-3-406 of the UCC, which reads in part:
"Any person who by his negligence substantially contributes to a material alteration of the instrument ... is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's...business." (Emphasis added.)
Although the trial judge could have been more precise by referring directly to § 7-4-401 in the beginning of the charge, we hold that the charge, when read as a whole, correctly states the applicable law.
AmSouth also contends that an instruction given by the trial judge on the apportionment of damages between Ferguson and the bank was erroneous. AmSouth objected to the instruction because it was AmSouth's position that apportionment of damages between the defendants was not proper. Instead, AmSouth argued that the instruction should provide that AmSouth could "be held liable under one count; namely, the one under the Uniform Commercial Code in which the damages are limited to the face amount of the check, but not be held liable on the fraud and conspiracy count." After the bank made its objection to the court's charge, the judge went back before the jury a second time and charged again. The jury was instructed that AmSouth could be liable under one count, but not all counts. Furthermore, after this second charge session, the bank did not restate its "apportionment" objection. We find no error in this regard.
AmSouth's proposed instruction # 15 states as follows:
"15. In order for a check to be a valid, negotiable check, it must contain only the following:
"(a) It must be signed by the maker of the check;
"(b) It must contain an unconditional promise or order to pay a sum certain in money;
"(c) It must be payable on demand or at a definite time; and
"(d) It must be payable to the order of a specific person or to the bearer of the check.
"If a check contains each of these four things, then the check is valid and negotiable."
This is taken virtually verbatim from UCC § 3-104(1), which sets forth the identical four criteria of negotiability.
In its instructions to the jury, the trial court added the following: "unless the bank has been given notice of some alteration or irregularity." AmSouth contends that this addition is an erroneous statement of the law, which served to undermine its defense. We do not agree.
In the stream of commercial transactions, the check was a negotiable instrumentit met all four of the criteria as stated in AmSouth's proposed instruction.
*1037 Under the facts of this case, the issue was not whether the check was a negotiable instrument, but whether the bank knew that Ferguson's completion of the check was unauthorized. The check may have been "negotiable," but according to § 7-4-401(2)(b), which is the basis for Spigener's suit, if the bank had knowledge of an unauthorized alteration by Ferguson, then it could not properly charge his account under applicable provisions of the UCC. We, therefore, find no error with this instruction in the factual context of this case.

II. PUNITIVE DAMAGES
AmSouth argues that it was error for the trial court to permit the award of punitive damages against AmSouth for the following reasons: (1) the trial judge erroneously implied that the jury could award punitive damages for wantonness; (2) Citizens Bank acted in good faith reliance on advice of counsel; and (3) AmSouth was not involved in the transaction.
AmSouth's first argument is that the trial judge erroneously implied to the jury that it could award punitive damages against AmSouth for wanton conduct in its handling of the check in question. Section 7-4-103(5) of the UCC provides that where there is bad faith (dishonesty in fact) in the handling of a check, consequential damages are allowed. AmSouth argues that since bad faith is a more culpable form of conduct than wantonness, it makes no sense that punitive damages could be recovered for conduct that is less culpable, and thus it was error for the judge to so imply.
The court's charge as to damages recoverable for violation of the UCC was as follows:
"On the complaint of simple negligence [violation of § 7-4-401], the award of compensatory damages only is allowed. You cannot award punitive damages for a simple negligence finding. Now, you couldunder theif you find that the bank acted improperly under the provisions of the Uniform Commercial Code and I read some of those provisions to youthat the limit of their liability would be the amount of the check on that particular account. Now, as far as the fraud and civil conspiracy counts are concerned, punitive damages would be allowable if you find that the fraud is malicious, oppressive or gross and representation made with the knowledge of the falseness, or so recklessly made as to amount to the same thing, then there could be an award for punitive damages under one of those two counts.
"...
"If you find in favor of the Plaintiff and against the bank for violating the Commercial Code, you may not award damages in excess of the amount of the check; that is, $25,000, unless you find that Citizens Bank acted in bad faith. If you find that Citizens Bank acted in bad faith, you may also award damages as suffered by Mr. Spigener as a proximate consequence."
These instructions properly limited the recovery of damages for violation of § 7-4-401 to compensatory damages. Again, the punitive damages award by the jury, to be upheld, must be supported by the evidence offered in support of the fraudulent concealment and civil conspiracy claims. We now turn to those claims.

III. DIRECTED VERDICT MOTIONS ON THE FRAUDULENT CONCEALMENT AND CONSPIRACY CLAIMS
The bank next contends that the trial court erred in failing to grant its motion for directed verdict on Spigener's claims of fraudulent concealment and civil conspiracy.
A. Fraudulent Concealment
Ala.Code 1975, § 6-5-102, provides: "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." AmSouth argues that the claim for fraud must fail on two grounds: (1) Citizens was under no duty to communicate to Spigener the existence of the $25,000 check before paying *1038 it; and (2) Citizens lacked the necessary intent to injure Spigener.
"Courts have traditionally viewed the relationship between a bank and its customer as a creditor-debtor relationship which does not impose a fiduciary duty of disclosure on the bank." Baylor v. Jordan, 445 So.2d 254, 256 (Ala.1984). However, § 6-5-102 also provides that the obligation to communicate may arise from the particular circumstances of the case. Spigener's evidence before the jury included the following suspicious circumstances which surrounded the presentation of the $25,000 check:
(1) The check was on a form that was at least thirteen years old.
(2) The check was a counter check.
(3) The check had no account number.
(4) The check had an out-of-date bank routing number.
(5) The check had an out-of-date FDIC symbol.
(6) The check was payable to an ex-wife by the name of `Ferguson' and not `Spigener.'
(7) The check was payable to an ex-wife of thirteen years.
(8) The check's payee's name was typed. The rest of the check was handwritten.
(9) The signature was in a different color ink from the rest of the handwritten parts of the check.
(10) The handwriting of the signature is different from the other handwritten parts of the check.
(11) The check was for a large amount not customarily written.
(12) The check was dated for February 1, 1983, an obvious misstatement since the check had been issued for some thirteen years.
(13) The check was completed by the ex-wife of the drawer.
There are other circumstances surrounding this transaction that drew the check into question. It is significant that attorney Reneau who represented the bank and advised it to cash the $25,000 check also represented Spigener in his divorce from Ferguson. Reneau testified that a full and final property settlement had been entered between Spigener and Ferguson 13 years earlier and that he had never been told by Spigener that part of the divorce settlement included signed blank checks to be completed by Ferguson at a later time. It is also significant that Ferguson personally appeared before high ranking bank officials on presentment of the check.
As previously mentioned, the UCC imposes upon the bank the duty to exercise ordinary care, see § 7-4-103(5) and comment 4 to § 7-4-103, and to act in accordance with commercially reasonable banking practices. See § 7-3-406.
Both sides presented expert testimony on the issue of whether the bank exercised ordinary care and paid the check in accordance with reasonable commercial standards of the banking business. The bank's own expert, Kenneth R. McCartha, testified that "[i]f you have reason to believe that there is concern or suspicion, certainly, it is a practice to call the customer." There was evidence before the jury which indicated that the bank officials had suspicion and concern about the check, and yet, Spigener was not contacted. McCartha also testified that if the bank in fact had knowledge on February 1, 1983, that the check had been issued and outstanding for 13 years and was incomplete until completed on that same day, then the bank should have called Spigener. Vice President Joe Graham testified that while Ferguson was in his office on February 1, 1983, she told him that she had personally filled the check out for $25,000, and that she had gotten the check from Spigener prior to her divorce from him. Graham also knew that both Spigener and Ferguson had married different people since their divorce.
Spigener's two experts opined that Citizens did not follow commercially reasonable banking practices of the banking industry. One expert stated that he thought there were enough discrepancies with regard to the instrument itself that Citizens should have investigated further, as opposed to paying the check. Both testified that in their opinion, the bank should have *1039 contacted Spigener before paying the check to Ferguson.
Thus, the jury had before it evidence to support the conclusion that the bank failed to exercise ordinary care and did not act in accordance with reasonable banking practices as mandated by the UCC.
Likewise, for purposes of § 6-5-102, the particular and very unusual circumstances of this case could give rise to an obligation of the bank to communicate with Spigener about the presentment of the check by his ex-wife. Ordinarily, there is no duty of disclosure on a bank with its customer. Baylor v. Jordan, supra. But this is no ordinary banking case. This is not a case where a bank receives a check, either in the regular course of business or through the mail, or even over the bank's counter by a bank teller. Rather, it is a case where a large check is brought in person by a woman known to be the ex-wife of the bank's customer. Furthermore, it is brought directly to one of the highest ranking officials at the bank. The official was aware that the drawer and payee had been divorced and that each had since remarried. He was also aware that the check was completed by the ex-wife on the day of presentment. The bank's attorney, who was consulted about the check, not only knew that the payee and drawer were divorced, but he had represented the drawer in the divorce 13 years prior.
AmSouth vigorously argues that if a drawee bank owed its depositor a duty to call each time it received a check bearing his genuine signature, but completed in handwriting other than the depositor's, an unprecedented and paralyzing burden would be placed on commercial transactions. If this were the only irregularity involved in this case, we would agree with AmSouth. But this case involved much more. The particular circumstances of this case would rarely, if ever, reappear again. Our holding that under the facts of this case the bank had a duty to contact its customer will not result in a paralyzing burden upon commercial transactions.
AmSouth's second contention with regard to the fraud claim is that the bank lacked the requisite scienter to support a claim for fraudulent concealment. In Marshall v. Crocker, 387 So.2d 176 (Ala.1980), this Court discussed the elements of concealment:
"Concealment implies design, or purpose.... The concealment must be for the purpose of continuing a false impression or delusion under which the purchaser has fallen, or of suppressing inquiry, and thereby effecting a salewith the intention to conceal or suppressand it must operate an inducement to the contract."
387 So.2d at 179, quoting from Jordan & Sons v. Pickett, 78 Ala. 331 (1884).
AmSouth points out that the testimony was undisputed that Spigener was one of the bank's largest depositors and best customers; that he had transacted business at the bank since the day it first opened; that Bill Reneau, the bank's counsel of many years, was a close personal friend of Spigener's and that Watt Jones and Joe Graham had always enjoyed good business relations with him. On the other hand, Ferguson had done very little business with the bank. Furthermore, her loan was small and secured by property of much greater value. Thus, the bank and its officers had everything to lose and nothing to gain by intentionally harming Spigener.
There was, however, also evidence from which the jury could have inferred that the bank acted with the requisite scienter. Intent may be established by circumstantial evidence. Old Southern Life Ins. Co. v. Woodall, 326 So.2d 726 (Ala. 1976). Attorney Reneau testified that he assumed that if Spigener had been contacted prior to the cashing of the check, Spigener would have put a stop order on the check. There was evidence that at least one bank official knew that Ferguson was experiencing financial difficulties on February 1, 1983, and that she intended to pay off her loan with the bank with the proceeds of the $25,000 check. The jury apparently believed that the bank elected not to contact its customer so as to assure itself that one of its loans would be paid off.
*1040 A directed verdict motion may not be granted if reasonable inferences may be drawn from the evidence presented in support of the claim against which the motion is made. O'Donohue v. Citizens Bank, 350 So.2d 1049 (Ala.Civ.App.1977). A motion for directed verdict or JNOV cannot be granted if there is any conflict in the evidence for the jury to resolve. Baker v. Chastain, 389 So.2d 932 (Ala.1980). Garrett v. Key Ford, Inc., 456 So.2d 77 (Ala. Civ.App.1984). Although this case presents a close question, we find that there was evidence to submit to the jury Spigener's claim of fraudulent concealment. The trial court did not err in denying AmSouth's motion for directed verdict on this claim.

B. Civil Conspiracy

AmSouth finally contends that Spigener's claim for civil conspiracy to defraud fails for three reasons, namely, (1) absence of duty, (2) absence of scienter, and (3) lack of evidence that Citizens Bank entered into any combination or agreement to defraud Spigener.
In Snyder v. Faget, 295 Ala. 197, 326 So.2d 113, 119 (1976), in quoting from Jolowicz & Lewis, Winfield on Torts, Conspiracy 557, 559, 560 (8th ed. 1967), we summarized the necessary elements of civil conspiracy as follows:
"`(a) Purpose. The most important feature of a tortious conspiracy where unlawful means are not used is that the object or purpose of the combination must be to cause damage to the plaintiff. It is not a matter of "intention" as that word is normally used in the law, for intention signifies not what a person is aiming at but what may reasonably be expected to flow from what he does, while for conspiracy the test is "what is in truth the object in the minds of the combiners when they acted as they did." Malice in the sense of malevolence, spite or ill-will is not an essential for liability; what is required is that the combiners should have acted in order that (not so that) the plaintiff should suffer damage. If they did not act in order that the plaintiff should suffer damage they are not liable, however selfish their attitude and however inevitable the plaintiff's damage may have been.
"`...
"`(b) Combination. There must, of course, be concerted action between two or more persons....
"`(c) Overt act causing damage....
[A]n overt act causing damage is an essential of liability in tort....'"
AmSouth's first two reasons, absence of duty and absence of scienter, which AmSouth contends defeat Spigener's claim of civil conspiracy, have already been addressed in the discussion on fraudulent concealment. As for the third ground, we find that there was evidence from which the jury could have found an agreement between the bank and Ferguson to defraud Spigener. The trial court did not err in denying the motion for directed verdict on the claim of civil conspiracy.
Joe Graham testified that he received a phone call from Ferguson on or about January 27, 1983, and that Ferguson stated that she intended to pay off her loan with Citizens Bank with the proceeds of a large check that she intended to cash at Citizens. Graham told her to bring the check in. Graham also denied taking any action on the check until the day that Ferguson presented it, February 1, 1983. Watt Jones, on the other hand, testified that Graham contacted him after Ferguson's call, but prior to February 1, 1983, and Graham told him that Ferguson would be bringing in a large check that she intended to fill out when she arrived at the bank. Attorney Reneau stated that he thought he had spoken to Graham one or two times prior to February 1, 1983, about Ferguson's presenting a check which was apparently 13 years old and drawn on Spigener's account. There was a question about whether its age would make any difference, regardless of what the date on the check showed.
On February 1, 1983, Ferguson went to the bank and completed the check for $25,000, dating it February 1, 1983. Graham was aware that she completed the check.
*1041 Graham again discussed the check with Jones and Reneau. They decided to cash the check without contacting Spigener. Graham knew that Ferguson was going to pay off the loan with the bank with the proceeds of the check. On February 9, 1983, Spigener learned about the check and contacted the bank. No one at the bank informed him that a portion of the proceeds from the check was used to pay off Ferguson's loan.
There was evidence before the jury from which they could find an agreement between the bank and Ferguson.
The purpose of punitive damages is to punish and deter the wrongdoer. AmSouth argues that since it had no involvement with the transaction at issue, it cannot be held liable for punitive damages. Under the terms of the merger, AmSouth assumed both the assets and liabilities of Citizens. But be that as it may, this issue was not presented to the trial court and cannot, therefore, be raised for the first time on appeal as grounds for reversal. Smiths Water Authority v. City of Phenix City, 436 So.2d 827 (Ala.1983); Chatman v. City of Prichard, 431 So.2d 532 (Ala. 1983).

IV. EVIDENTIARY RULINGS
Questions of materiality, relevance, and remoteness of the evidence rest largely with the trial judge, and his rulings must not be disturbed unless his discretion has been grossly abused. Ryan v. Acuff, 435 So.2d 1244 (Ala.1983); May v. Moore, 424 So.2d 596 (Ala.1982).
We have carefully reviewed the four alleged erroneous evidentiary rulings made by the trial judge. We do not find any gross abuse of discretion; therefore, we do not disturb his rulings.

V. REMITTITUR
AmSouth argues that the court wrongfully refused to order Spigener to remit all but $25,000 of the $1,000,000 verdict. It also contends that the $1,000,000 jury verdict was excessive and resulted from bias, passion, and prejudice, and it was therefore entitled to a new trial. The trial court denied AmSouth's motion.
In the recent case of Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), this Court adopted and announced a new procedure for the trial court when considering remittitur. Hammond set forth the requirement that the trial court reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages. As explained in Hammond, the trial judge is better positioned to decide whether the verdict is flawed, as he has the advantage of observing all of the parties to the trial, as well as the jury and its reaction to the proceedings.
"Our cases reflect a number of factors which are appropriate for the trial court's consideration: The culpability of the defendant's conduct, Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125 (Ala.1981); the desirability of discouraging others from similar conduct, Ford Motor Credit Co. v. Washington, 420 So.2d 14 (Ala.1982); the impact upon the parties, Alabama Power Co. v. Hussey, 291 Ala. 586, 285 So.2d 92 (1973). These are by no means exclusive. Justice may well require consideration of other factors, such as the impact on innocent third parties. We make no attempt to enumerate all of the factors which may be considered by the trial court. We instead leave that to its sound discretion. We do emphasize, however, that only where the record establishes that the award is excessive or inadequate as a matter of law, or where it is established and reflected in the record that the verdict is based upon bias, passion, corruption, or other improper motive may a trial court order a new trial or remittitur. Only by requiring that a record be made can this Court adequately discharge its role of appellate review of trial court action in either granting or refusing to grant a new trial where remittitur is granted or denied."
493 So.2d at 1379. See also Harmon v. Motors Insurance Corp., 493 So.2d 1370 (Ala.1986) and our opinion on rehearing *1042 issued the same day in Alabama Farm Bureau Mutual Casualty Insurance Co. v. Griffin, 493 So.2d 1379 (Ala.1986).
Having thoroughly reviewed the numerous issues, the briefs, and the record in this case, we find no reversible error as alleged by AmSouth with respect to the jury charges, with the denial of its directed verdict motions, or with the evidentiary rulings made by the trial court. We affirm in all aspects except the amount of the judgment and remand the cause to the trial court for the entry of an order as required by Hammond, supra. The trial court in its discretion may order a further hearing to reconsider the claim that the verdict is excessive. In any event, it is to state its reasons for any action it takes on this issue for the record and report its findings and conclusions to this Court within 28 days of the issuance of this opinion.
AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.[*]
MADDOX, JONES, ALMON, BEATTY, ADAMS and STEAGALL, JJ., concur.
HOUSTON, J., dissents.
TORBERT, C.J., not sitting.
HOUSTON, Justice (dissenting):
Because I believe that the trial court should have directed a verdict in favor of AmSouth, as requested by AmSouth, on the fraudulent concealment count and because I do not believe that punitive damages are appropriate in this case, I dissent. The majority predicates its opinion on the fact that this is no ordinary banking case and that the particular circumstances of this case would rarely, if ever, reappear. Hard facts have been known to make bad law.

Fraudulent Concealment
Section 6-5-102, Code 1975, provides:
"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
A bank and its depositor stand merely in a debtor-creditor relationship, not a confidential relationship. Reynolds v. McEwen, 416 So.2d 702 (Ala.1982); Southern Hardware & Supply Co. v. Lester, 166 Ala. 86, 52 So. 328 (1910). This principle has been entrenched in the law of Alabama since at least 1910; it has been applied as recently as 1984 in the case of Baylor v. Jordan, 445 So.2d 254 (Ala.1984). In Baylor, this Court affirmed a summary judgment for a bank on a customer's claim of fraudulent concealment because the bank did not owe the customer a duty to disclose. Justice Faulkner, writing for a division of this Court, stated:
"Courts have traditionally viewed the relationship between a bank and its customer as a creditor-debtor relationship which does not impose a fiduciary duty of disclosure on the bank...." 445 So.2d at 256
Therefore, there is no confidential relationship between the bank and Spigener and the bank/customer relationship would not be a particular circumstance which would impose a duty of disclosure on the bank.
The majority in this case holds that some or all of the following "particular circumstances" may impose a duty on a bank to contact a customer before it honors a valid negotiable instrument bearing the customer's genuine signature and his explicit, unconditional order to pay:
(1) The presentation of an old form counter check bearing a current date with no account number on it (these are particular circumstances one through five, and twelve, as set out by the majority). Would this alone impose this duty? What if the customer customarily carried and used counter checks, as Spigener did? Would *1043 that make a difference? If so, are we imposing upon banks the duty to ascertain a customer's past banking practice or to contact the customer before honoring a valid negotiable counter check containing an explicit unconditional order to pay? What if the counter check is the kind of counter check currently being used by the bank? Does this make a difference?
(2) The payee of the check is an ex-spouse (this is the essence of particular circumstances six, seven, and thirteen). Would this alone impose such a duty on a bank? What if the drawer of the check still lived next door to the ex-spouse? Spigener and Ferguson lived next door to each other at the time the check was honored. Would this affect what the bank must do? Are we then imposing upon a bank the duty of ascertaining the relationship between the payee and the drawer of a valid negotiable instrument bearing the drawer's genuine signature and his explicit, unconditional order to pay, and the duty of contacting the drawer if the relationship between the drawer and the payee is out of the ordinary?
(3) Part of a check is typed and the other part is written in different handwriting or written in different colored ink (these are the majority's particular circumstances eight through ten). Does this alone impose such a duty on a bank? What if the drawer customarily signed a check and had the payee or another fill in the rest of the check, as Spigener frequently did? Would that affect the duty?
(4) The check was for a large amount (larger than checks customarily written particular circumstance eleven). Would this alone impose such a duty on a bank? If so, how much larger must the check be: twice as large as the amount of the checks customarily written? $5, $50, $500, more?
(5) The bank's attorney, who was contacted by bank officials and asked if the check should be honored, had represented the drawer of the check in his divorce against the payee of the check. Would this particular circumstance alone impose on the bank the duty to disregard its attorney's advice and require it to contact the drawer of the check before honoring it?
(6) The payee of the check appeared before high ranking bank officials on presentment of the check. Does this particular circumstance alone impose a duty on the bank to call the drawer before honoring a valid negotiable instrument containing the drawer's explicit, unconditional order to pay?
If none of these particular circumstances alone imposes this duty, what combination imposes such a duty?
What if the drawer of the check cannot be contacted? Is not the bank in a "Catch 22"? If it honors the check, it is for the trier of fact to determine if the bank is guilty of fraudulent suppression; if it refuses to honor the check it is for the trier of fact to determine if the bank is guilty of wrongful dishonor.
The risk of loss from the payment of a check signed in blank must be placed on the drawer of the check.
In S.S. Allen Grocery Co. v. Bank of Buchanan County, 192 Mo.App. 476, 182 S.W. 777, 781 (1916), the following appeared:
"Every consideration of justice and common sense sustains the conclusion that a depositor should affix his signature to a blank check only for the purpose of directing the bank to pay out the money, and that the risk of signing and then keeping a blank check, whether the keeping be careful or negligent, should be a risk the maker voluntarily assumed.... If the exigencies of the depositor's situation create a necessity for the signing of checks in blank, and then keeping them a time before putting them into circulation, why should he not bear the risk made by his own necessities, rather than the banker, who is a stranger to them, and is under the contractual duty to honor his written orders for the payment of money?"
When a bank customer signs a blank check using the customary signature on file at the bank, and a third party obtains possession of this check and completes it, *1044 the check becomes a valid negotiable instrument containing an explicit, unconditional order to pay. The bank customer must know that the bank on which the check is drawn will honor this check when it is presented in the regular course of commerce. If payment has not been stopped on it, the mere fact that such a check will be paid when presented cannot be the basis for an action of fraudulent supression.
Where a defendant files a motion for directed verdict as to a count that is not supported by the evidence, detailing with specificity the grounds upon which the particular count is not supported by the evidence, and the Court denies the motion, a general jury verdict will not be assumed to have been returned on account which is supported by the evidence. Russellville Production Credit Ass'n v. Frost, 484 So.2d 1084 (Ala.1986); Old Southern Life Ins. Co. v. Spann, 472 So.2d 987 (Ala. 1985); City of Huntsville v. Certain, 453 So.2d 715 (Ala.1984), cert. denied 472 U.S. 1027, 105 S.Ct. 3499, 87 L.Ed.2d 631 (1985); Cincinnati Ins. Co. v. Little, 443 So.2d 891 (Ala.1983); John Deere Indus. Equipment Co. v. Keller, 431 So.2d 1155 (Ala.1983); Ex parte Nix, 401 So.2d 64 (Ala.1981); Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981).
At the close of Spigener's evidence, AmSouth moved for a directed verdict as to the fraudulent concealment count, with the requisite specificity; AmSouth again, at the close of all of the evidence, moved for a directed verdict as to that count, again with the requisite specificity.

Punitive Damages
A suit for wrongfully honoring a negotiable instrument (whether alleged as fraudulent suppression, conspiracy, or under § 7-4-401, Code 1975) is in essence a suit arising out of the breach of a contractual relationship between the bank and its depositor. Sherrill v. Frank Morris Pontiac-Buick-GMC, Inc., 366 So.2d 251 (Ala. 1978). This Court has held that punitive damages are not recoverable for breach of contract outside the insurance context.
Kennedy Electric Co. v. Moore-Handley, Inc., 437 So.2d 76 (Ala.1983).
Even before the UCC was enacted, it was clear that a bank could not be subjected to punitive damages for paying a check bearing the depositor's genuine signature. 9 C.J.S. Banks and Banking, § 353 at 722 (1938): "In an action ... for illegally or wrongfully paying checks or orders, the measure of damages is the sum paid out with interest from the date of payment."
This rule was codified in § 7-4-103(5), Code 1975, which limits a bank's damages for improper payment of a check to the face amount of the check plus, in the case of "bad faith," consequential damages. Sherrill v. Frank Morris Pontiac-Buick-GMC, Inc., supra. The following cases have interpreted this UCC section, § 4-103(5), as not permitting punitive damages: Bagby v. Merrill Lynch, Pierce, Fenner & Smith, 491 F.2d 192 (8th Cir.1974); Joffe v. United California Bank, 141 Cal.App.3d 541, 190 Cal.Rptr. 443 (1983); Beir v. Manufacturers Hanover Trust Co., 110 A.D.2d 529, 488 N.Y.S.2d 1 (1985); Titan Air Conditioning Corp. v. Chase Manhattan Bank, N.A., 61 A.D.2d 764, 402 N.Y.S.2d 12 (1978); Singleton v. National Bank of North America, 43 A.D.2d 857, 351 N.Y. S.2d 722 (1974).
I am aware that there has been an increase in the number of contract cases in which punitive damages have been awarded and that Professor Gilmore contends that this is a particular illustration of a more general phenomenon: the reabsorption of contract law into the main body of tort law from which contract principles emerged more than a century ago. G. Gilmore, The Death of Contract 83 (1974). Whether the judicial attitude permitting recovery of punitive damages in contract cases is calculated or casual, decisions liberalizing the availability of punitive damages in contract cases have "contributed to a process of change which has greatly increased the territory occupied by Dean Prosser's shadowy borderland between tort and contract. How rapidly it may proceed and where it will ultimately lead no careful scholar can confidently predict." T. Sullivan, *1045 Punitive Damages in the Law of Contract: The Reality and the Illusion of Legal Change, 61 Minn.L.Rev. 207, 252 (1977). I am for it proceeding no farther; at least not until we have formulated sufficient standards governing punitive damages awards.
When a negotiable instrument is wrongfully honored by a bank, what are our standards for permitting the drawer of the instrument to recover punitive damages? Must there be evidence of insult, or contumely, or malice (none of which is present in the case before the Court), or does the wrongful honor of the instrument in and of itself constitute legal insult, contumely, or malice sufficient to justify an award of punitive damages? We have been warned that the lack of sufficient standards governing punitive damages awards in Alabama may be violative of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. See Aetna Life Insurance Co. v. Lavoie, ___ U.S. ___, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986), wherein this argument was referred to as an important issue which in an appropriate setting must be resolved.
NOTES
[*] Reporter's Note: Following the remand of this case, the parties filed with the Supreme Court a "joint motion to dismiss appeal after settlement." The Supreme Court, on December 19, 1986, entered the following order: "IT IS ORDERED, on joint motion of the parties, that the appeal in this cause be, and the same is hereby, dismissed."